**UNITED STATES of America**

v.

**JERROLD ELECTRONICS CORPORATION, National Jerrold Systems, Inc., Jerrold-Northwest, Inc., Jerrold-Southwest, Inc., Jerrold-Ohio, Inc., Jerrold Mid-Atlantic Corporation, and Milton Jerrold Shapp.**

**Civ. A. No. 22080.**

United States District Court
E. D. Pennsylvania.
July 25, 1960.
As Amended Oct. 10, 1960.
Final Judgment Oct. 11, 1960.

Robert A. Bicks, Wilford L. Whitley, Jr., John F. Hughes, and Sidney Harris, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Israel Packel, Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

This action was commenced with the filing of a complaint on February 15, 1957, charging Jerrold Electronics Corporation, its president, Milton Jerrold Shapp, and five of its corporate subsidiaries with being parties to a conspiracy and contracts in unreasonable restraint of trade and commerce in community television antenna equipment in violation of § 1 of the Sherman Act (15 U.S.C.A. § 1); with being parties to a conspiracy and attempting to monopolize trade and commerce in community television antenna equipment in violation of § 2 of the Sherman Act (15 U.S.C.A. § 2); and with contracting to sell and making sales

upon unlawful conditions in violation of § 3 of the Clayton Act (15 U.S.C.A. § 14). The complaint was amended with approval of the court on April 2, 1959, to charge the defendants additionally with effecting a series of corporate acquisitions which were alleged to be unlawful under § 7 of the Clayton Act (15 U.S. C.A. § 18) and §§ 1 and 2 of the Sherman Act. The matter was tried before this court from November 9 to December 18, 1959. The parties then submitted their requests for findings of fact and conclusions of law, bringing this suit to its present posture.

## I. Jurisdiction and Venue.

The jurisdiction and venue of this court with respect to this matter are not, and cannot be, in dispute. They are based on the following findings of fact:

1. The individual defendant, Milton Jerrold Shapp, resides within the Eastern District of Pennsylvania.

2. Jerrold Electronics Corporation was incorporated under the laws of Pennsylvania in 1948 and was the parent corporation of the other corporate defendants, National Jerrold Systems, Inc., Jerrold Northwest, Inc., Jerrold Southwest, Inc., Jerrold-Ohio, Inc., and Jerrold Mid-Atlantic Corporation.

3. The defendant, Jerrold Electronics Corporation, was incorporated under the laws of Delaware on April 15, 1955, and succeeded to the assets and business of the Pennsylvania corporation of the same name, which is now dissolved.

4. The defendant, Jerrold Electronics Corporation, is continuing the same business with the same corporate name and under the same management and control as the Pennsylvania corporation.

5. At the end of February 1958, all of the defendant subsidiaries went through corporate procedures to merge into Jerrold Electronics Corporation except Jerrold Northwest, which transferred all of its assets to Jerrold Electronics Corporation and went through dissolution proceedings.

6. The defendant, Jerrold Electronics Corporation, transacts business and has its principal office within the Eastern District of Pennsylvania.

## II. Background.

Jerrold Electronics Corporation (hereinafter "Jerrold") was incorporated under the laws of Pennsylvania in March 1948 by Milton Shapp to engage in the sale of a television booster developed by one of his friends. This device was designed to improve television reception in fringe areas by amplifying the weak signals available there. At Shapp's request, his friend began working on the development of master antenna equipment. The purpose of this equipment was to enable a single antenna to serve a number of television receivers. It was inspired by the numerous antennas rapidly rising on the roofs of television set dealers' business establishments and apartment houses.

Jerrold installed the first operational master antenna system for Montgomery Ward in Baltimore during the summer of 1949. The success of this system resulted in a number of orders from other dealers. At first, this master antenna equipment was sold through the distributors who were handling Jerrold's booster. This proved unsatisfactory, however, because these distributors and their customers lacked the technical training and experience with respect to master antenna systems which was necessary to install and maintain them properly. Consequently, the Jerrold people were constantly called upon to put improperly installed, mal-functioning systems in working order. Jerrold felt compelled to render this time-consuming service in order to protect the reputation of its product. In an effort to solve this problem, it was decided in late 1949 that the master antenna equipment would only be marketed through distributors who had men specially trained in the sale, installation and maintenance of master antenna systems. Distributors who satisfied these requirements were designated "M" distributors. Jerrold also set up its own sales organization, Mul-T-V Sales Company, in Philadelphia to handle directly all sales of Jerrold equipment in

this area. This method proved more satisfactory than the independent "M" distributors in Shapp's estimation, but financial limitations prevented its use on a larger scale.

In October 1950, Shapp was approached by a group of men from Lansford, Pennsylvania, who were interested in bringing television into their community. The people of Lansford were unable to receive any television signals through the use of conventional equipment because of the town's location. It was possible to receive a signal on a hilltop approximately a mile outside of town, however. They wanted to set up an antenna at this site and hook it up with receivers in the town. Subscribers to their service would pay a connection fee and monthly service charge. Basically, the envisioned system involved the same concept used for dealers and apartment houses of a single antenna for a number of receivers, but on a much larger scale. The difference in size was important, however. Shapp had already discovered that the equipment designed for dealers was inadequate for use in the larger apartment houses and had recently started developing new equipment for this purpose designated "CL." In addition, there usually was no problem with the quality of the signal at the antenna in a single building master system, since the dealers' establishments and apartment houses were generally located in strong signal areas. It was, therefore, readily apparent to Shapp that modifications would be necessary in order to install a working master antenna system in a community. It was equally apparent to him that this was a natural and promising area for Jerrold to enter, since there were many communities which, because of distance or topographical features, were in the same predicament as Lansford and had no immediate hope of obtaining television from any other source because of the freeze on the licensing of new television stations in effect at that time.

Shapp and the Lansford group finally worked out a mutually satisfactory arrangement. Jerrold was to install a system using its standard equipment, which the Lansford people would purchase. Jerrold was to use the system as an on-the-spot laboratory to work on the problems it anticipated, discover new problems, and develop the equipment necessary to eliminate them. As it was developed, the new equipment was to be exchanged for the original equipment in the system without additional cost to the Lansford group. A few days later, a similar arrangement was made with a group from Mahanoy City, Pennsylvania. Other groups interested in the same program were turned down because Shapp felt he had taken on all that he could handle in view of the expected difficulties.

The Lansford system was "turned on" in mid-December 1950 and the Mahanoy City system went into operation in January 1951. Both systems at that time were built with Jerrold's standard equipment designed for showrooms and small apartments. The initial results were deemed successful and the systems received considerable publicity, including articles in the Wall Street Journal and Newsweek magazine, since they were the first significant operational systems of this kind. As a result of the publicity, Shapp was approached by people from hundreds of communities interested in community antenna systems, both as a means of bringing television into their homes and as a profitable investment. These people came from all walks of life. Many of them had little or no technical background or knowledge. Furthermore, the system that went into operation in Lansford in December 1950 was only connected to a few showrooms. With the extension and continual operation of the system, the anticipated problems began to arise. They were of such a magnitude that Shapp's organization was completely tied up analyzing them and designing new equipment to cope with them. Also, there were several instances in which aspiring community system operators had obtained Jerrold's standard equipment through its distributors and attempted to install systems

with unsatisfactory results. Under these circumstances, it was decided that no Jerrold equipment would be sold for community purposes until gear adequate to the task had been developed.

Some acquaintance with the technical aspects of a community television antenna system is essential to a full understanding of the contentions of both parties in this matter. This seems to be the most appropriate point to digress from the narrative to describe the nature of such a system and some of the particular problems which faced Jerrold and other companies which entered this field.

There are four parts to a community television antenna system. The first is the antenna site, referred to in the trade as the "head end." The second is the apparatus which carries the signal from the antenna into the community, known as the "run to town." The third is the "skeleton system" that is constructed through the town to carry the television signals to the extremities of the area to be covered. ·Finally, there is the "tap-off" from the skeleton system which carries the signal to the home of each subscriber to the service.

In addition to the antenna itself, the head end equipment usually includes pre-amplifiers to increase the signal strength, filters and traps to eliminate unwanted signals, automatic gain control (AGC) to make a signal of fluctuating strength constant, converters (explained below), and amplifiers to send the processed signal on its way to town.

The run to town in most systems consists of cable. As the signal is transmitted through the cable, it diminishes in strength. Therefore, it becomes necessary to insert amplifiers at various points along the way in order to restore the signal to the required level. This feature of signal loss also dictates the use of converters at the head end. The higher the frequency of the signal, the greater the amount of signal loss sustained. This makes it desirable to convert high frequency channels to a lower frequency in order to reduce the amount of loss and, consequently, the number of amplifiers necessary in the system. Converters are also used to change the frequency of a channel when another channel received by the system is of a relatively similar frequency, since it was discovered that otherwise the two channels caused interference with each other during transmission. In later years, microwave has been used instead of cable in locations where the distance from the antenna site to the town was so great that the cost of installing and maintaining cable was prohibitive.

The skeleton system consists of a series of main cables which branch off from the run to town, feeder lines which, in turn, branch off from the main cables, electronic distribution units or non-electronic splitters at each of these junctions which draw off the signal, and such amplifiers as are necessary to keep the signal at a sufficient strength. One of the main problems which primarily concerns the skeleton system, but also affects the run to town, is that of radiation. Unless proper precautions are taken, the signal will escape from the cable. This creates both the danger of interference with the reception of individuals who are able to receive television signals without subscribing to the system's services and the danger of people picking up the escaped signal from the air without paying for the service. Radiation, therefore, imposes limitations on the type of cable that can be used and the strength at which the signal can be carried.

The tap-off consists of a "T" inserted in the feeder line or a device which pierces it to draw off the signal, which is then delivered to the home by a cable. The television set receives the signal upon connection with a terminal unit at the end of this cable.

The installation of a successful community television antenna system involves more than simply purchasing certain items of equipment and hooking them together. Each system presents different problems giving rise to different equipment needs because of variations in the frequency, quantity and quality of the signals available at the

antenna site, the length of the run to town, and the layout of the town itself. Proper planning is necessary to keep equipment costs at a minimum and, at the same time, produce a saleable picture in town. In the first place, the best antenna site must be determined considering the signals present and the distance from town. The run to town must be set up keeping in mind future maintenance problems. Similarly, the most efficient routing of the lines in town must be determined. In this connection, there arises a special problem of negotiating with the utility companies for the use of their poles. This aspect is important, both in terms of costs and acceptability to the community, since there may be an adverse reaction to the erection of additional poles and wires. Then there is the problem of selecting equipment of the proper specifications, including antennas and cable, as well as electronic gear. Finally, it is essential that the equipment be properly spaced along the line so that the input signal is at a proper level.[1]

### III. Tie-in Sales.

By the spring of 1951, the Jerrold people felt they were prepared to start selling equipment for community television antenna purposes. As a result of their work in Lansford and Mahanoy City, they had developed a new line of equipment for community antenna systems designated "W" equipment. After consulting with his engineers and several of Jerrold's commission salesmen who dealt with the distributors, Shapp decided that the W equipment should only be sold with engineering services to insure that the system would function properly. A general policy, therefore, was established of selling electronic equipment to community antenna companies only on a full system basis and in conjunction with a service contract which provided for technical services with respect to the layout, installation and operation of the system.

The first of the service contracts employed by Jerrold in executing this policy was designated Form 103 (Exhibit 35). Under this agreement, Jerrold undertook, among other things, to supply the antenna company with engineering plans and a bill of materials indicating the equipment necessary for the system; to assign an engineer to supervise the installation, test and balance out the system, and instruct the antenna company's personnel in these matters; to repair and replace obsolete, as well as defective and worn out, equipment; and to realign or replace equipment if a change occurred in the frequency of the channels received and distributed by the system (the antenna company was to purchase a converter from Jerrold if the frequency change required one). The antenna company agreed, among other things, to pay a flat fee for the engineering plans and, if it then decided to go on with the project, to pay $5 for each connection when made and 25¢ a month for each receiver that remained connected to the system, with a minimum fee of $75 a month. The antenna company also agreed to have in its employ a person trained by a Jerrold engineer or at its school in Philadelphia who would be responsible for "on the premise" maintenance and operation of the system. Paragraph 8 of Form 103 provided:

"8. That in the event Antenna Company desires to receive and distribute the signals of any television stations other than those being received and distributed at the time of the initial installation of the System, Antenna Company agrees to purchase, at the then prevailing prices, whatever additional Jerrold Equipment may be necessary to receive and distribute the desired signals throughout the System, and it is understood that a maximum of three (3) television channels can be so received and distributed in the presently designed System."

1. The facts stated under this heading are consistent with plaintiff's request for findings of fact Nos. 8, 9, 12, 13, 18–23, 31, 35 and 38 and with defendants' requests for findings of fact Nos. 11–13, 36 and 37.

Paragraph 12 of the contract provided:

"12. That Antenna Company agrees that it will not install, as part of the System, any Equipment or attachments which in the opinion of Jerrold will impair the operation of the System or impair the quality of television reception and signal distribution capabilities of the System, or that might cause damage to or impair the efficiency of any of the Equipment comprising the System."

The contract was to remain in effect for five years. According to the testimony in this case, the first sales under this contract were made in late May 1951.[2] In August 1952, this contract was superseded by Form 103A (Exhibit P–47) and Form 103B (Exhibit P–48). They were basically the same as their predecessor, the principal difference being in the payment provisions. Paragraphs 8 and 12 quoted above remained unchanged.[3]

In October 1953, the Form 103A and 103B service contracts were replaced by the WK–1 Form (Exhibit P–79). The new contract was generally the same as its predecessors. A few changes were made in some of the provisions relevant to the case at bar. The provision contained in paragraph 8 of the earlier contracts[4] was eliminated. Also, the language formerly appearing in paragraph 12[5] now appeared in paragraph 8 and was revised to read as follows:

"VIII. Since the parties acknowledge that Jerrold cannot reasonably be required to perform its obligations hereunder if the System comprises electronic equipment other than that manufactured by Jerrold Electronics Corporation, Antenna Company agrees that it will not install, as a part of the System any equipment or attachments which, in the opinion of Jerrold, will impair the quality of television reception and signal distribution capabilities of the System, or which might cause damage to, or impair the efficiency of, any of the Equipment comprising the System."

Finally, the duration of the contract was reduced from five to two and one-half years.

On March 16, 1954, Jerrold offered its customers two more service contracts designated SP–1 (Exhibit P–99) and SP–2 (Exhibit P–100). The period of their use overlapped that of the WK–1 contract. The SP–1 contract was designed to accompany the sale of new systems and was of six months' duration. The SP–2 contract was designed to make Jerrold service available to existing systems and was of one year's duration. Each of these contracts contained the following provision, similar to those in the earlier contracts:

"Since we cannot reasonably be required to perform our obligations as enumerated in this letter if the system contains electronic equipment other than that manufactured by Jerrold Electronics Corporation, you agree not to install, as part of the system, any equipment or attachments which, in our opinion, will impair the quality of television reception and signal distribution capabilities of the system, or which might cause damage to, or impair the efficiency of, any of the equipment comprising the System."[6]

The Government contends that Jerrold's policy and practice of selling on a system basis only and of making sales only in conjunction with a service contract constituted unlawful tie-ins in violation of § 1 of the Sherman Act (15 U.S.C.A. § 1) and § 3 of the Clayton Act (15 U.S.C.A. § 14). It also asserts that

---

2. But see Exhibit D–25.

3. Paragraph 8 became paragraph 6(a) and paragraph 12 became paragraph 9 in the 103B contract, however.

4. Paragraph 6(a) of Form 103B.

5. Paragraph 9 of Form 103B.

6. The facts stated in this hearing are consistent with plaintiff's requests for findings of fact Nos. 95, 96, 99, 100 and 104 (except the SP–2 contract was of one year's duration) and defendant's requests for findings of fact Nos. 39, 42–44, 47 and 49.

the provision in the 103 series contracts for the exclusive use of Jerrold equipment for the addition of extra channels to the system, and the provision in all of the contracts not to install unapproved, non-Jerrold equipment, violated these sections of the anti-trust laws.

### III-A. Service Contracts.

Jerrold freely admits that it was its policy from May 1951 to March 1954 not to sell its equipment designed for community antenna systems except in conjunction with a service contract which would assure Jerrold supervision over its installation and maintenance.[7] It also acknowledges that this policy was generally followed except where sales resistance induced authorized and unauthorized deviations. The Government contends that this policy and practice constitutes an unlawful tie-in under the anti-trust laws because Jerrold is using its market power over its equipment to induce operators to buy its service. Consequently, their freedom of choice is curtailed and competition on the merits with respect to the services is restrained.

The Government concedes that § 3 of the Clayton Act does not apply to this situation because that section, by its terms, only concerns "goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C.A. § 14.[8] It does not apply to tie-ins involving services. The Government asserts, however, that sales upon the condition that the purchaser subscribe to the services of the vendor constitute an unreasonable restraint of trade in violation of § 1 of the Sherman Act.[9] The defendants claim that this requirement was reasonable and offered evidence on this point, which was received over the objection of the Government which maintained that

the contracts were unreasonable *per se* under the decision in Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545.

In the Northern Pacific case, supra, the defendant sold and leased land on the condition that the grantee or lessee use its facilities for shipping all commodities produced or manufactured on the land, provided that its rates and services were equal to those of competing carriers. The Supreme Court sustained a summary judgment against the railroad on the grounds that the condition violated § 1 of the Sherman Act. It stated at page 6 of 356 U.S., at page 518 of 78 S.Ct. that "They (tying agreements) are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected."

It is clear from the amount of service rendered by Jerrold under its compulsory service contracts that a "not insubstantial" amount of interstate commerce was affected, particularly in view of the relatively limited market. Jerrold has stated, in response to the Government's interrogatories, that it executed over 120 of these contracts from May 1951 to March 1954. It is also noted that Jerrold reported to the Small Business Administration in August 1954 that it had installed more than 250, or 80%, of the community systems in the United States. Jerrold's income from the 103 series contracts and the WK–1 contracts between the years 1952 and 1957 was approximately $870,000. Because of Jerrold's deferred payment policy and the fact that most of these services were performed during the planning and installa-

---

7. The parties are not in agreement as to when this policy terminated. This issue is discussed in fn. 15, infra.

8. See fn. 22, infra, where this section is quoted more fully.

9. "Every contract, * * * or conspiracy, in restraint of trade or commerce among the several States, * * * is

declared to be illegal: * * *." 15 U.S. C.A. § 1. The restraint must be unreasonable. Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Board of Trade of City of Chicago v. United States, 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683.

tion stages, it is fair to assume that most of this income represents payment for services rendered between 1951 and 1954, when these contracts were being signed. Furthermore, Jerrold admittedly failed to collect all that was due under these contracts. Therefore, it is apparent that these income figures do not completely reflect the amount of commerce involved.

A more difficult question is presented by the second requirement that Jerrold be shown to have sufficient economic power with respect to its equipment to appreciably restrain free competition in the market for the services it rendered. The minimum amount of economic power required is by no means clear.[10] Fortunately, the facts of this case obviate the necessity of ascertaining that standard. In resolving this matter, the first task is to determine the relevant market in which to measure Jerrold's power. Since in this aspect of the case we are only concerned with power which will appreciably restrain competition in the market for the services of installing, maintaining and operating community antenna systems, we are necessarily only interested in power over equipment used in community systems. Jerrold admits that, as to the sale of complete community television antenna systems, it was an undoubted leader up until mid-1954, and more than a majority of the new systems from 1950 to mid-1954 were purchased from it.[11] Indeed, Jerrold consistently advertised throughout this period that at least 75% of the community systems in the United States were "Jerrold systems." Economic power over a product can be inferred from sales leadership. Northern Pacific Railway Co. v. United States,

supra, 356 U.S. at page 19, 78 S.Ct. at page 525 (dissent). The Supreme Court also stated in the Northern Pacific case that the requisite economic power can be inferred from the very existence of the tying clauses where no other explanation for their use is offered. The majority of the court appears to feel that this explanation must include a showing of some benefit conferred upon the purchasers in return for their sacrifice of a free choice of alternatives, but also considered the seller's motive.[12] This is an extremely difficult burden to meet and, in the opinion of this court, it has not been satisfied by the evidence offered by the defendants in the case at bar. Another fact from which economic power can be inferred is the desirability of the tying product to the purchaser. Northern Pacific Railway Co. v. United States, supra, 356 U.S. at page 19, 78 S.Ct. at page 525 (dissent).[13] Mr. Shapp has stated that Jerrold's highly specialized head end equipment was the only equipment available which was designed to meet all of the varying problems arising at the antenna site. It was thus in great demand by system operators. This placed Jerrold in a strategic position and gave it the leverage necessary to persuade customers to agree to its service contracts. This leverage constitutes "economic power" sufficient to invoke the doctrine of per se unreasonableness.

While the trial judge is of the opinion that the Government has established both of the prerequisites necessary for treating Jerrold's policy and practice of selling its community equipment only in conjunction with a service contract as unreasonable, per se, under the Northern Pacific decision, he does not believe that the inquiry must end there in view of the rather unique circumstances involved in

---

10. See Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L.Rev. 50–59 (1958).

11. Defendants' request for finding of fact No. 99.

12. 356 U.S. 1, 7–8, 78 S.Ct. 514, 2 L.Ed. 2d 545. Much of the evidence objected to by the Government under its theory

of per se unreasonableness was admissible for this purpose.

13. None of Jerrold's community system equipment was covered by a valid patent. Jerrold did own a methods patent of untested validity covering the master antenna technique, known as the Kallman Patent (see pages 570 and 571 of 187 F.Supp. infra).

this particular case. Any judicially, as opposed to legislatively, declared *per se* rule is not conclusively binding on this court as to any set of facts not basically the same as those in the cases in which the rule was applied. In laying down such a rule, a court would be, in effect, stating that in all the possible situations it can think of, it is unable to see any redeeming virtue in tying arrangements which would make them reasonable. The Supreme Court of the United States did not purport in the Northern Pacific case to anticipate all of the possible circumstances under which a tying arrangement might be used. Therefore, while the *per se* rule should be followed in almost all cases, the court must always be conscious of the fact that a case might arise in which the facts indicate that an injustice would be done by blindly accepting the *per se* rule. In this case, the court felt that the facts asserted by the defendants in their pre-trial statement and trial brief warranted hearing their testimony and argument on the issue of reasonableness. It was partly influenced in this decision by the fact that the history of the industry was brief, and the position of the defendants did not seem to require a prolonged economic investigation—factors which the Supreme Court felt justified the *per se* rule.

When Jerrold was ready to place its W equipment on the market in May 1950, it was confronted with a rather unique situation. In the first place, while it was convinced that its equipment would work, Jerrold recognized that it was sensitive and unstable. Consequently, modifications were still being made. Jerrold had further misgivings because its experience was limited to two locations. New situations were bound to arise in other communities which would require further adjustments in the equipment. Secondly, as has already been noted, there were hundreds of people anxious to set up community antenna systems. Most of these people had no technical background at all. None of them had

any experience with community systems since, at that time, there was only one other operating system in the country besides the Jerrold systems in Lansford and Mahanoy City.[14] In addition, many of these people did not have solid or extensive financing to back their proposed venture. Finally, Jerrold had directed most of its resources towards the development of its community equipment. It was of utmost importance to it that its investment prove successful.

Shapp, his engineers and salesmen, envisioned widespread chaos if Jerrold simply sold its community equipment to anyone who wanted it. This fear was based on more than mere speculation. Experience with the less complicated dealer and apartment systems bolstered their view, as did the history of community systems installed by operators on their own with Jerrold's standard equipment obtained from its M distributors. A rash of systems with unsatisfactory pictures could not be tolerated. The amount of capital necessary to start a system was substantial. Interest would wane rapidly if the systems installed did not consistently produce satisfactory results. Not only Jerrold's reputation but the growth of the entire industry was at stake during the development period. In addition to its reputation, Jerrold was also dependent upon successful system operation for payment. Many operators were not in a position to pay cash for the necessary equipment and the risks were such that outside financing could not be obtained. Therefore, payment was often contingent on the success of the system. It appeared that it was cheaper and more practical to insure that a system was properly installed in the first place than to attempt to get it operating once it was strung up. Furthermore, as has already been noted, use of existing utility poles was an important cost and public relations factor. The utility companies were reluctant to have men of unknown ability working on their poles. Therefore, it was desirable that the sys-

14. This was an experimental system of R. C. A.'s in Pottsville, Pa.

tem be installed under the supervision of men whose ability was known to the utility companies through other dealings. For these reasons, it was decided that community equipment should be sold with engineering services in order to foster the orderly growth of the industry on which the future of Jerrold depended.

The Government does not dispute the reasonableness of the contracts for services but objects to the fact that they were compulsory. The crucial question, therefore, is whether Jerrold could have accomplished the ends it sought without requiring the contracts. It has been suggested that Jerrold could have accomplished the same results by addressing the persuasive argument it made to this court to its customers and leaving use of the contracts on a voluntary basis. See United States v. International Business Machines Corp., D.C.S.D.N.Y.1935, 13 F.Supp. 11, 19–20, affirmed 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085. This argument assumes that Jerrold and the industry could survive the "transitory disloyalties" this approach would entail. Jerrold's service was costly and many operators, because of their limited finances, preferred to do-it-themselves and save the expense. Furthermore, Jerrold's limited facilities required that they only commit themselves to a certain amount of work. If Jerrold's equipment was available without a contract, many impatient operators probably would have attempted to install their systems without assistance. Consequently, unless Jerrold instituted a policy of compulsory service, it could expect many operators to buy its equipment without a contract, despite the strong reasons for having one, and the effort spent to present them. Jerrold's supply of equipment was limited. Unrestricted sales would have resulted in much of this equipment going into systems where prospects of success were at best extremely doubtful. Jerrold's short and long-term well-being depended on the success of these first systems. It could not afford to permit some of its limited equipment to be used in such a way that it would work against its interests. A wave of system failures at the start would have greatly retarded, if not destroyed, this new industry and would have been disastrous for Jerrold, who, unlike others experimenting in this field such as R. C. A. and Philco, did not have a diversified business to fall back on but had put most of its eggs in one precarious basket in an all out effort to open up this new field. Compare the facts in Northern Pacific Railway Co. v. United States, supra, and United States v. General Motors Corporation, 7 Cir., 1941, 121 F. 2d 376, certiorari denied 1941, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, relied on by the Government. For these reasons, this court concludes that Jerrold's policy and practice of selling its community equipment only in conjunction with a service contract was reasonable and not in violation of § 1 of the Sherman Act at the time of its inception. Compare General Talking Pictures Corporation v. American Telephone & Telegraph Co., D.C.D.Del.1937, 18 F.Supp. 650.

The court's conclusion is based primarily on the fact that the tie-in was instituted in the launching of a new business with a highly uncertain future. As the industry took root and grew, the reasons for the blanket insistence on a service contract dissappeared. The development of the community antenna industry throughout the country was not uniform. It advanced and became established most rapidly in the East, particularly in Pennsylvania. Progress was slower in the Northwest and Southwest. Thus, when the reasons for this policy ceased to exist in the East, there were still good reasons for its continuance in other areas. Oral reports of successful systems 3,000 miles away are not as convincing as a number of failures nearby. Jerrold recognized this fact and abandoned its policy gradually. In March 1954, it dropped the policy as a general rule and thereafter applied it on an area-by-area and case-by-case basis.[15] Mr. Shapp candidly admits

15. The Government contends that Jerrold abandoned this policy because of the threat of Government anti-trust action. The court finds to the contrary. It is

that he can "not make the assertion that in each stage of this evolution our timing has been exactly correct."[16] It seems clear that there is bound to be some lag in a situation such as this. On the present record, it would be a matter of speculation to determine when Jerrold's policy was no longer justified in various areas of the country. In view of the Northern Pacific case, it would seem that Jerrold has the burden on this point. Since it is not necessary for purposes of granting the relief requested to find more than that at some time during its use, Jerrold's tie-in of services to equipment became unreasonable,[17] this court makes no finding as to when this occurred. It is content to say that, while Jerrold has satisfied this court that its policy was reasonable at its inception, it has failed to satisfy us that it remained reasonable throughout the period of its use,[18] even allowing it a reasonable time to recognize and adjust its policies to changing conditions.[19] Accordingly, the court concludes that the defendants' refusal to sell Jerrold equipment except in conjunction with a service contract violated § 1 of the Sherman Act during part of the time this policy was in effect.[20]

### III-B. Full System Sales.

Jerrold also admits that it was its policy and practice from May 1951 to March 1954 not to sell its various items of equipment designed for community antenna systems separately, but only to sell them as components of a complete system.[21] As a result of this program, individual pieces of Jerrold equipment were unavailable for both new systems and existing non-Jerrold systems. The Government contends that this too constitutes an unlawful tie-in because Jerrold is driving competitors from the field by using its market power with respect to some of its equipment to induce the purchase of other equipment it manufactures.

■ Since this aspect of Jerrold's activity involves the tying of goods to goods, § 3 of the Clayton Act,[22] as well

clear that Jerrold persisted in this policy in some areas of the country after it was aware of the Government's interest in the matter. It would, therefore, seem that the Government's activity was not a motivating factor.

16. Exhibit P–153, at p. 69.

17. As to whether it is appropriate to characterize the installation aspect of the service contracts as being tied to the sale of equipment at all, see sub-heading III–B, particularly fn. 28.

18. In addition to changes in the condition of the industry, it is also noted that there is some indication in the record that in some areas of the country Jerrold was unable to give the service it felt was necessary to install a successful system. Nevertheless, a contract was required. While this court feels that Jerrold was hopeful that the service would be adequate, it feels that it was unreasonable to make sales on this condition when it could not meet its obligations. The proper course would have been to make sales free of any contract requirement or refuse to make any sales at all, as it had done betweeen January and May 1951.

19. The facts stated under this sub-heading are consistent with plaintiff's requests for findings of fact Nos. 46–49, 51, 97, 103, 106, 109, 122, 125, 102 and 105 (except that the last two findings should be prefaced by the words "in some instances") and with defendants' requests for findings of fact Nos. 58 and 99.

20. The defendants' argument that no conspiracy can be shown is not supported by the law or the facts. Plaintiff's requests for findings of fact Nos. 88–94 and 101 are adopted by the court except that with respect to request No. 93 it is noted that Jerrold-New York is not a defendant. See Schine Chain Theatres, Inc. v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; Goldlawr Incorporated v. Shubert, 3 Cir., 1960, 276 F.2d 614, 617.

21. The Government contends it continued longer but the court disagrees. See footnote 15, supra.

22. "It shall be unlawful for any person engaged in commerce, * * * to * * * make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, * * * on the condition, agreement, or understanding that the * * * purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a com-

as § 1 of the Sherman Act, is applicable. This court finds it unnecessary in this case to engage in a discussion of the differences, if any, in the burden imposed on the Government to make out its case under these sections.[23] It is sufficient for our purposes to note that the burden imposed by the Sherman Act is at least no less than that imposed by the Clayton Act. See Times Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 608–609, 73 S.Ct. 872, 97 L.Ed. 1277. The court's determination of the relevant market and finding as to Jerrold's position in that market when considering the engineering service contract requirement are equally applicable to this aspect of the case.[24] The record also makes it clear that a not insubstantial amount of commerce was affected.

█ The difficult question raised by the defendants is whether this should be treated as a case of tying the sale of one product to the sale of another product or merely as the sale of a single product.[25] It is apparent that, as a general rule, a manufacturer cannot be forced to deal in the minimum product that could be sold or is usually sold. On the other hand, it is equally clear that one cannot circumvent the anti-trust laws simply by claiming that he is selling a single product. The facts must be examined to ascertain whether or not there are legitimate reasons for selling normally separate items in a combined form to dispel any inferences that it is really a disguised tie-in.[26]

█ There are several facts presented in this record which tend to show that a community television antenna system cannot properly be characterized as a single product. Others who entered the community antenna field offered all of the equipment necessary for a complete system, but none of them sold their gear exclusively as a single package as did Jerrold. The record also establishes that the number of pieces in each system varied considerably so that hardly any two versions of the alleged product were the same. Furthermore, the customer was charged for each item of equipment and not a lump sum for the total system. Finally, while Jerrold had cable and antennas to sell which were manufactured by other concerns, it only required that the electronic equipment in the system be bought from it.

In rebuttal, it must first be noted that the attitude of other manufacturers, while relevant, is hardly conclusive. Equally significant is the fact that the record indicates that some customers were interested in contracting for an installed system and not in building their own. Secondly, it was the job the system was designed to accomplish which dictated that each system be "custom made" in the sense that there were variations in the type and amount of equipment in each system. This, in turn, explains determining cost on a piece by piece, rather than a lump sum, basis. Finally, while the non-electronic equipment could be ordered from other sources and the system would be useless without the antenna and connecting cable, it is generally agreed that the electronic equipment is the most vital element in the system and

petitor or competitors of the * * * seller, where the effect of such * * * sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C.A. § 14.

23. See Turner, The Validity of Tying Arrangements Under The Antitrust Laws, 72 Harv.L.Rev. 50, 57–8 (1958).

24. See page 555 of 187 F.Supp., supra.

25. This argument was not considered and could not have been reasonably made in

any of the tying cases before the courts previous to this. See, e. g., United States v. International Business Machines Corp., 1936, 298 U.S. 131, 56 S. Ct. 701, 80 L.Ed. 1085 (tabulating cards for machines); International Salt Co., Inc. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (salt for machines).

26. For a discussion of the considerations involved in this aspect of the case, see Turner, The Validity of Tying Arrangements Under The Antitrust Laws, 72 Harv.L.Rev. 50, 67–72 (1958).

Jerrold was still in charge of assembling all of the equipment into a functioning system.

Balancing these considerations only, the defendants' position would seem to be highly questionable. The several deviations from the normal situation one would expect to find become particularly suspect when viewed in the context of Jerrold's market leverage resulting from its highly regarded head end equipment. There is a further factor, however, which, in the court's opinion, makes Jerrold's decision to sell only full systems reasonable. There was a sound business reason for Jerrold to adopt this policy. Jerrold's decision was intimately associated with its belief that a service contract was essential. This court has already determined that, in view of the condition of Jerrold, the equipment, and the potential customers, the defendants' policy of insisting on a service contract was reasonable at its inception. Jerrold could not render the service it promised and deemed necessary if the customer could purchase any kind of equipment he desired. The limited knowledge and instability of equipment made specifications an impractical, if not impossible, alternative. Furthermore, Jerrold's policy could not have been carried out if separate items of its equipment were made available to existing systems or any other customer because the demand was so great that this equipment would find its way to a new system.[27] Thus, the court concludes that Jerrold's policy of full system sales was a necessary adjunct to its policy of compulsory service and was reasonably regarded as a product as long as the conditions which dictated the use of the service contract continued to exist.[28] As the circumstances changed and the need for compulsory service contracts disappeared, the economic reasons for exclusively selling complete systems were eliminated. Absent these economic reasons, the court feels that a full system was not an appropriate sales unit. The defendants have the burden not only of establishing the initial existence of the facts necessary to support their claim but also their continuing existence in view of the fact that it is not disputed that the conditions did change. The defendants have not satisfied this latter burden. It has already been noted that on the present record it would be a matter of speculation to determine how long the conditions justifying Jerrold's policy remained in effect.

The defendants also assert a further justification for its policy insofar as it applied to systems using a large quantity of non-Jerrold equipment. Jerrold spent considerable time and effort in developing its head end equipment. As a result, its equipment was considered the best available and an asset to any system, since it affected the quality of the initial signal which would be transmitted through the rest of the system. The head end equipment, while intricate, did not represent a large portion of the investment in a system because only a few items were involved. The real profit in a system came from the sale of the amplifiers, since a large number were involved. Jerrold felt that other companies who had not invested time and money into the development of satisfactory head-end equipment sought to take advantage of it by competing with it as to the amplifiers, but relying on Jerrold's head end equipment to make the system successful. Shapp resented these other companies "picking our brains" and competing for the real source of profit. Jerrold, therefore, felt justified in recovering its substantial investment in the development

27. There are numerous references in the record to cases where Jerrold's equipment was discovered in non-Jerrold systems which was procured from system operators as second-hand and excess equipment and from Jerrold distributors in violation of their authority from Jerrold.

28. Jerrold's argument that it was selling a legitimate single product and that no tying was involved would also apply to the installation aspect of the service contracts, since this covers the assembly of the components into the marketed product.

of superior head end equipment by using it to preserve for itself a share of the more lucrative market for amplifiers. While the court is sympathetic with Jerrold's predicament, it does not feel that it provides sufficient justification for the use of a tying arrangement. If the demand for Jerrold's equipment was so great, it could recover its investment by raising its prices. Admittedly, the return would not be as great, but it provides sufficient protection to serve as a more reasonable and less restrictive alternative to a tying arrangement.[29]

The court concludes that the defendants' policy of selling full systems only was lawful at its inception but constituted a violation of § 1 of the Sherman Act and § 3 of the Clayton Act during part of the time it was in effect.[30]

### III-C. The Veto Provisions.

■ In addition to initially selling its equipment only on a full system basis, Jerrold also imposed certain limitations on the equipment that could be added to the system in the future by means of certain provisions in its service contracts. One of these is the provision appearing in all of the contracts to the effect that the operator shall not install any unapproved, non-Jerrold equipment.[31] The Government contends that these clauses prohibit the use of competitive equipment. It is apparent that these clauses do not absolutely require the use of Jerrold equipment as did the provisions involved in United States v. International Business Machines Corp., 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085, and International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.[32] Equipment approved by Jerrold was also permitted. As a matter of law, Jerrold's approval would have to be a genuine decision, but not necessarily a reasonable one. Restatement of Con-

tracts, § 265. While this genuine decision rule would permit Jerrold to withhold its approval arbitrarily so that competitive equipment would be excluded, there is no indication that any of the parties to these contracts ever contemplated that Jerrold would take such a position. The courts have consistently held that non-enforcement is no defense because the existence of the restrictive language itself is sufficient to deter many from acting contrary to its command, rather than test the promisee's attitude toward the requirement. Northern Pacific Railway Co. v. United States, supra; International Salt Co. v. United States, supra; United Shoe Machinery Corporation v. United States, 1922, 258 U.S. 451, 42 S. Ct. 363, 66 L.Ed. 708; United States v. General Motors Corporation, 7 Cir., 1941, 121 F.2d 376, certiorari denied 1941, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 495. Jerrold argues that this is not a question of whether or not the provision was enforced but of the extent to which it was restrictive. It urges that the language is ambiguous, allowing Jerrold wide latitude of action on its face, and that no one would assume that it absolutely prohibited use of competitive equipment, even if, as a matter of contract law, Jerrold could take a position which would have that effect. Thus, the argument concludes, Jerrold's course of conduct under these provisions is relevant.

The case of Emsig Manufacturing Co. v. Rochester Button Co., D.C.S.D.N.Y. 1958, 163 F.Supp. 414, supports the defendants' contentions. In that case, the manufacturer of a patented button feeding machine leased these machines only on the condition that the lessee use buttons approved by the lessor. The lessor also sold buttons. The court held that whether or not this provision required the use of the lessor's buttons was a ques-

---

29. Defendants' request for finding of fact No. 38 is consistent with the facts stated under this subheading.

30. As to the conspiracy element of the Sherman Act violation, see footnote 20, at page 558 of 187 F.Supp.

31. These provisions are set forth at page 554 of 187 F.Supp., supra.

32. In the latter case, the defendant had to meet any lower price of competitors but otherwise there was no flexibility.

tion of fact which must be determined by examining the actual practice under the lease. It is noted that this case was decided by the same court which decided the International Business Machines case, supra. The court agrees with the defendants' position on this point. An examination of the record discloses uncontradicted testimony concerning numerous systems which used non-Jerrold equipment without objection, although this fact was known to the defendants. On the other hand, no instances were brought to the court's attention in which it is clear that an operator considered himself unable to obtain non-Jerrold equipment because of the veto clause.[33] The court finds that these provisions were not intended, and were not used, to prevent the use of competitive equipment in systems covered by a service contract.

The veto provisions were necessary to protect Jerrold in view of its maintenance obligations under the contracts and its financial interest in the success of the systems. Reasonable restraints are permissible for such purposes. International Salt Co., Inc. v. United States, supra. The restraint imposed by the requirement that Jerrold approve all equipment other than that it manufactured is reasonable in view of the meaning given to this provision as evidenced by Jerrold's conduct with respect to it. It must also be noted that, because of the instability of the equipment and rapid growth of the industry, the use of pre-determined specifications, rather than the more flexible approval approach, would probably have been more restrictive if Jerrold was to be afforded the protection to which it was entitled.[34]

### III-D. The Additional Channels Provision.

The Government also challenges the provision appearing in the 103 series contracts which requires operators to purchase from Jerrold the equipment necessary to receive any stations in addition to those received at the time of the initial installation. The defendants contend that their systems were set up to receive and distribute three channels. Often less than that number were available at the time the system was installed. In order to spare the operator the expense of this equipment, which might never be utilized, Jerrold provided for its purchase at a later date. The defendants argue that this provision was justified because "it would be a business folly to try to fit someone else's equipment into the actual spaces provided for additional channels."[35] They also urge that these provisions are consistent with its policy of full system sales.

The court agrees with the Government that these provisions constitute unlawful tie-ins in violation of § 1 of the Sherman Act and § 3 of the Clayton Act, regardless of the defendants' actual motives. It can discover no reasons which justify this absolute restriction on the operator's choice of equipment which are not served by the "veto provision." The court has recognized Jerrold's interest in installing the system initially and the resulting requirement that the electronic equipment be exclusively Jerrold. It sees no valid reason for extending this requirement to equipment which might be added five years later. Jerrold was adequately protected in this respect by the veto provision and the merits of its "business folly" contention when addressed to its customers.[36]

33. The testimony introduced by the Government on this point was that of equipment salesmen and not of the operators themselves. There is no indication whether these statements referred to the "veto provision," to the provision concerning channel expansion, or both. The Government referred to the same testimony with respect to both provisions. See plaintiff's requests for findings of fact Nos. 115 and 116.

34. Plaintiff's request for finding of fact No. 110 and defendants' request for finding of fact No. 52 are consistent with the facts stated under this sub-heading.

35. Defendants' trial brief, p. 10.

36. Plaintiff's requests for findings of fact Nos. 111 and 116 are consistent with the facts stated under this sub-heading.

## IV. Corporate Acquisitions.

In 1955, Jerrold commenced a program of purchasing community systems throughout the country. The funds for this extension of Jerrold's activities into the operational aspect of the community television antenna industry were provided by the public issue of Jerrold stock. Jerrold has purchased ten systems as of this date [37] and has asserted that it intends to continue this program provided the court agrees with its contention that these acquisitions are lawful. The Government asserts that these acquisitions are in violation of § 7 of the Clayton Act (15 U.S.C.A. § 18).[38] More specifically, it contends that by acquiring control of some of the consumers of community television antenna system equipment, Jerrold is securing a steady customer for its own products and depriving competitors of a potential buyer. The Government argues that the effect of these acquisitions may be substantially to lessen competition, or to tend to create a monopoly.

The defendants claim that the systems were purchased solely for investment and thus come within a specific exemption to § 7 of the Clayton Act.[39] In support of this contention, they point out that in the fiscal year ending in February 1959, 62% of Jerrold's total profit after taxes from all operations came from its operation of these acquired systems. While this evidence indicates that a major purpose of Jerrold in acquiring these systems was as an investment, it does not establish that this was a sole purpose. Jerrold obtained 100% control of all of these systems, except the one it later sold, and it owned 80% of the lat-

ter. One would expect a wholly-owned subsidiary to purchase its equipment needs from its parent when the latter manufactures those items. Indeed, this is not a matter of pure speculation in this case, since the record discloses that Jerrold made sales to these subsidiaries from 1956 to 1959 totalling $426,338.85 and that no significant purchases were made from Jerrold's competitors during this period. Under the circumstances, the court cannot say that these acquisitions were made solely for investment.

The question remains whether the effect of these acquisitions may be substantially to lessen competition, or to tend to create a monopoly in any line of commerce in any section of the country. This determination must be made on the basis of facts existing at the time the suit was brought, in this case on April 2, 1959, the date the complaint was amended, and not those existing at the time the companies were acquired. United States v. E. I. Du Pont De Nemours & Co., 1957, 353 U.S. 586, 597, 77 S.Ct. 872, 1 L.Ed.2d 1057. This is particularly important in the case at bar because of the rapid rate of growth of the industry involved which resulted in almost overnight changes in the equipment, its applications, and the available markets.

The court's first task is to determine the appropriate market or line of commerce in which to determine the effect of Jerrold's acquisitions. The defendants claim that community systems are just one application of master antenna systems and that the supply and demand throughout the United States for master antenna system equipment is the appropriate market. This would include

---

37. One of these systems was sold in May 1959.

38. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect

of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

\* \* \* \* \*

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."

39. See last paragraph of quoted portion of § 7 in footnote 38, supra.

equipment used for dealers' showrooms, apartments, hotels, hospitals, military installations and housing projects. The Government contends that, while community systems are an application of the master antenna system principle, the technical requirements and consumer preferences are such that they constitute a separate and distinct market within the master antenna system industry. Thus, the plaintiff concludes, the relevant market is the total demand by community television antenna system operators throughout the United States for community television antenna system equipment.

■■■ As has already been noted, the master antenna principle was first applied to systems for dealers' showrooms and small apartments and hotels. When its use was first extended to community systems, there was a substantial demand by operators for the equipment designed for the smaller systems, mainly because it was available and more specialized equipment was still in the process of being developed. From the outset, Jerrold and others recognized that there were technical, financial and public relations problems peculiar to community systems which distinguished them from the other existing types of master antenna systems. The most significant, distinguishing characteristics of community systems were their distance from the originating source of the signals, which necessitated equipment to process the signal before it was distributed, and the distance from the antenna to the television receivers, which required further pre-distribution processing and a series of amplifiers throughout the system.[40] As a result, special equipment and sales technique were evolved for these systems so that they could properly be regarded as constituting a separate and distinct market.[41] As time passed, new applications

of the master antenna system principle were discovered. Some of these presented problems more similar to those found in community systems than in dealer showroom and apartment systems. Large, gardentype apartments, military installations, and housing projects increased the distance between the antenna and receivers, thus requiring a series of amplifiers and, in some instances, converters. Some of these systems were so located that they also required pre-amplifiers, filters and AGC at the antenna site in order to achieve a distributable signal. The only factor remaining to distinguish these systems from community systems is the quasi-public utility nature of the latter systems affecting the degree of public responsibility demanded of them, and even this distinction can be questioned. It would also seem that the current trend is toward equipment of more general application as a result of technological advances affecting both design and cost.

The court is of the opinion that neither of the parties' choice of market is appropriate when one directs his attention, as the law requires, to the situation existing at the time the suit was brought, namely, April 1959. At that time, it is clear that some equipment originally designed for community systems was properly being used in other systems as well. Therefore, the market is somewhat broader than that suggested by the Government. It is equally clear that there still remains a separate and distinct market within the master antenna system field of systems requiring specialized signal processing equipment and numerous amplifiers. This equipment can be called community system equipment since it is used in virtually all such systems, but it must be recognized that it is not exclusively so used. With this understanding as to the sense in which the phrase "com-

---

40. See pages 551, 552 of 187 F.Supp., supra.

41. Some community system operators interested in cutting costs continued to attempt to use the cheaper equipment designed for smaller installations in their systems and some purchasers of single

building installations wanted "nothing but the best" and bought the more expensive community equipment, even though other equipment would have been sufficient. These deviations from the norm do not alter the delineation of the market, however.

munity system equipment" is used, the court concludes that the appropriate line of commerce with respect to the alleged violations of § 7 of the Clayton Act is the total demand for community television antenna system equipment throughout the United States.[42]

There can be no question that the effect of Jerrold's acquisition of these systems is to foreclose part of the market for community system equipment to its competitors. None of these systems have purchased any significant amount of equipment from companies other than Jerrold since they were acquired. While it has not been shown that Jerrold arbitrarily rejected competitive gear and was not acting with the best interests of the systems in mind in using its own equipment, it is clear that Jerrold has a distinct advantage in any sales competition. The issue raised by the defendants is whether the effect of the present and planned acquisitions may be substantially to lessen competition, or to tend to create a monopoly.

The Supreme Court has stated:

"Section 7 is designed to arrest in its incipiency not only the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock of a competing corporation, but also to arrest in their incipiency restraints or monopolies in a relevant market which, as a reasonable probability, appear at the time of suit likely to result from the acquisition by one corporation of all or any part of the stock of any other corporation. The section is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended." United States v. du Pont & Co., 1957, 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057.

The defendants insist that their present acquisitions are not likely to have the effects condemned by the statute. In support of this contention, they point out that they only own nine out of more than 500 systems in the country [43] and that, consequently, there is still a large market left for other suppliers.[44] The Government correctly states that the share of the market affected is not accurately re-

---

42. The record indicates that at the present time all sellers and purchasers of community system equipment deal in a national market. This was not true in earlier periods of the history of the industry, as pointed out by the plaintiff, but this is of no relevance to this alleged violation.

43. The plaintiff claims there are presently 560 community systems in the country. The defendants claim that 750 is a more accurate figure. The court expresses no opinion as to which is more correct.

44. In addition to existing community systems, the market also includes the other applications of community equipment and new community systems. It is noted, however, that this latter market appears to be fairly well exhausted due to the increase in television broadcasting stations which, in conjunction with the existing community systems, have made television available in almost all areas of the country. The major current market appears to be the modernization and expansion of existing systems. Jerrold's sales to its acquired systems for these purposes (including cable) in the fiscal year ending February 2, 1959, was $171,000.

The defendants also direct attention to the fact that only two of the acquired companies had any significant dealings with Jerrold's competitors before they were purchased, so that they were not deprived of any substantial outlet for their products which they previously enjoyed. [Compare the court's finding in United States v. Bethlehem Steel Corporation, D.C.S.D.N.Y.1958, 168 F.Supp. 576, 611–615, that the acquired corporation was a "substantial" customer of the acquiring concern's competitors.] This does not mean that they would not have done business with these systems in the future, however, which seems to be the proper consideration here.

The court need make no finding as to the defense that two of the systems were in a failing financial condition at the time they were acquired because it is unnecessary in view of its decision. However, it is doubted whether the defendants sustained their burden of proof on this point.

flected by the number of systems acquired, since they all have different amounts of equipment. The Government's figures based on the number of connections in each system are no more accurate, however. Each connection does not require more than a tap-off and a short length of cable. The significant factor is the amount of cable between the antenna site and the last tap-off on each feeder line. This would indicate the amount of cable and amplifiers one could expect to find in the system and these are the items which account for the greatest variation in the amount of equipment in each system. While a greater number of connections in a system might mean a greater amount of cable, this would depend upon the concentration of the population. Furthermore, the Government's figures do not take into account the run to town which substantially affects the amount of equipment in each system.[45]

■ Section 7 of the Clayton Act does not make every acquisition of a buyer by a seller unlawful, even though there is a reasonable probability that the acquired concern will secure its requirements from its owner in the future. There must be a reasonable probability that the acquisition will have the condemned effects of *substantially* lessening competition or tending to create a monopoly. United States v. E. I. Du Pont De Nemours & Co., supra. This determination is extremely difficult to make when each acquisition forecloses only a small segment of the market. The court is faced with the proposition of deciding when the defendant has gone too far where each acquisition lessens competition almost immeasurably. Yet at some point the cumulative effect of these acquisitions will reach prohibited proportions. This difficulty is compounded in the case at bar by the fact that the court does not feel that the present record contains the facts necessary to enable it to determine as accurately as possible the effect of these acquisitions on the market.

■ The court finds that the evidence presented in this case is not of such a quality that it can fairly say that any one of Jerrold's acquisitions to date, when combined with the ones before it, foreclosed a sufficient portion of the market so that there is a reasonable probability that the condemned effects will occur. While the Government is not bound to produce the best evidence possible under most circumstances, divestiture is a harsh and drastic remedy and the Government is obligated to produce evidence from which the court can determine, with reasonable accuracy, whether a violation has occurred. While the court does not feel that the evidence permits a determination of sufficient precision to justify divestiture, it is adequate for the court to roughly determine the percentage of the market foreclosed. This figure would be between 1.5% and 10%.[46] The defendants were in a position to be of great assistance to the court in determining the relevant data and collecting it, because of their position in the industry and familiarity with the problems involved. The court feels that they were not as cooperative in this respect as they might have been if they were sincerely interested in the court's ascertaining all the facts. Consequently, the court is entitled to draw certain inferences against them in this regard. These figures indicate that Jerrold's acquisitions are approaching, if not beyond, the point where it can be said that it is a reasonable probability that they will have the pro-

45. In view of the fact that the major market today is the modernization and expansion of existing systems, it would seem that the needs and potentialities of the existing systems in these respects would also be a relevant consideration.

46. The maximum figure is based on evidence that in the fiscal year ending 2/2/59, Jerrold's sales to its systems were approximately one-fifth of its total sales and there is evidence justifying a finding that Jerrold's total sales in 1959 amounted to 50% of the total national sales of community television antenna equipment.

hibited effects when they are examined in the context of Jerrold's prominent position in the industry. Therefore, the plaintiff is entitled to the injunctive relief it seeks as to any future acquisitions. This injunction will be limited to a period of three years from April 2, 1959, because of the quality of the Government's evidence and the history of rapid and dynamic changes this industry has exhibited. In the meantime, the defendants may apply to this court for an order modifying this injunction to permit any additional acquisitions which they feel they can justify.[47]

## V. Conspiracy and Attempt to Monopolize.

In addition to its specific charges that the defendants have engaged in a sales program involving unlawful tie-ins in violation of § 1 of the Sherman Act and § 3 of the Clayton Act and have made a series of corporate acquisitions in violation of § 7 of the Clayton Act, the Government charges that these and other actions of the defendants constitute a conspiracy and attempt to monopolize interstate trade and commerce in community television antenna equipment in violation of § 2 of the Sherman Act (15 U.S.C.A. § 2).[48] This section of the anti-trust laws condemns conspiracies or attempts to acquire the power to control prices in, or foreclose access to, a market. A finding of specific intent by the person or persons involved either to achieve this unlawful end or to conspire to do so is necessary to establish a violation of this section. Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277. This intent need not be proven by direct evidence but can be inferred from practices of the defendants. Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. The Government contends that the requisite intent in the case at bar can be inferred from the defendants' tie-in sales, corporate acquisitions and other activities.

The trial judge finds that Jerrold's policy of selling its equipment exclusively on a full system basis and in conjunction with a service contract, while not shown to be reasonable at all times in which it was in effect, was never intended by the defendants to drive competitors from the business of supplying equipment for community television antenna systems and to achieve a monopoly in this field for Jerrold. Among other things, it must be kept in mind that this policy was evolved and put into effect when Jerrold first marketed community antenna equipment. At that time, both R. C. A. and Philco were entering the business. Furthermore, the future of this brand new field was quite uncertain. It is highly unlikely that the most ambitious businessman would enter this business from the beginning with a policy intended to force such formidable competitors as these from the field and acquire the power to control prices or foreclose access to this market. The record contains numerous letters and memoranda of the defendants which, while confirming the existence of this policy, also indicate that their purposes were to promote the interests of their customers and to protect their investment in both the individual systems and the industry as a whole.[49] The fact that this policy may

---

47. The facts set forth under this heading are consistent with plaintiff's requests for findings of fact Nos. 10, 11, 14–17, 24–29, 36, 40–42, 224, 225, 226 (except that Jerrold never acquired more than an 80% interest in Key West Cable Vision, Inc.), 227, 236, 237, 239, 240, and defendants' requests for findings of fact Nos. 6–8, 10, 79, 81, 83, 89, 90, 92, 94–96, and 100. See defendants' answer to supplemental interrogatory No. 37 for current holdings of Jerrold's officers and directors in community television systems.

48. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor, * * *."

49. These documents include inter-office correspondence, as well as letters to out-

have been continued beyond the time it was in fact actually necessary does not mean that the defendants were not acting in good faith in maintaining it as long as they did.

■ As already noted, it is impossible to say that the community systems acquired by Jerrold were purchased solely for investment purpose. The record does indicate, however, that this was a primary purpose. Absent any proof of a sustained practice of arbitrarily supplying the equipment needs of these systems with Jerrold's products, the court does not feel that it is fair to infer any monopolistic intent from acquisitions on this scale. While the practice may tend to create a monopoly, and thus be subject to an injunction, it has not reached the point where it can be said to evidence an intent to achieve such a position.[50]

■ The Government contends, however, that the defendants have engaged in other activities from which an intent to achieve a monopoly in the field of community television equipment can be inferred. In particular, they charge that Jerrold's salesmen threatened to install competing systems with the aid of "Eastern capital" if an operator refused to purchase Jerrold equipment and that the defendants misused certain patents in an effort to force reluctant customers to purchase their equipment.

### V-A. Threats to Install Competing Systems.

The record indicates that the threats to install competing systems were made by only one person, Phil Hamlin, and occurred in only one section of the country.[51] Hamlin was associated with a distributor of Jerrold's community antenna equipment in the northwest section of the United States and became vice-president of Jerrold's sales subsidiary, Jerrold Northwest, on May 23, 1953, when it was created.

Jerrold had entered into an agreement with J. H. Whitney & Company (hereinafter "Whitney"), which was interested in investing money in community television antenna systems. Jerrold was to give Whitney a list of communities which met the technical requirements for a successful operation. Whitney then selected those which it felt offered the best opportunity for profit and organized a company to install and operate the system. Whitney agreed that these companies would purchase Jerrold equipment in compliance with Jerrold's full system and service contract policy.

Among the communities Jerrold recommended to Whitney as being suited for a community system from a technical standpoint were Wenatchee, Richland, Walla Walla and Aberdeen, in the State of Washington. Whitney found that the first three of these systems satisfied its requirements but rejected the fourth. In each of these locations, another community television antenna company was already conducting an antenna site survey or was in the process of construction. Two systems could not operate profitably in most communities and, consequently,

---

siders, and were not written under circumstances which would suggest that they were meant to be self-serving.

50. Intent is not a necessary element of a violation of § 7 of the Clayton Act. United States v. E. I. Du Pont De Nemours & Co., 1957, 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057.

51. The Government alleges two other threats of this nature, but the record is insufficient to establish them as such. On one occasion, a salesman named Titus mentioned to an operator who decided to use Entron equipment that "there was another party interested in operating a community antenna system in Corning."

This was no more than a statement of fact (see N. T. 1536). In the other instance, Shapp told an operator, who was installing a number of systems and who had rejected Jerrold equipment in favor of other equipment, that wherever Jerrold had a customer in a community where that operator was also constructing a system, there would necessarily be competition since Jerrold was interested in making sales and would, therefore, support its customer in any franchise dispute. There was no indication that Jerrold would actively solicit competition. The court sees no threat in this statement under the circumstances.

Whitney generally shied away from communities with other systems. However, if a community exhibited a sufficient profit potential and the other system showed signs of technical or other weaknesses, indicating it would not be completed or, if completed, would not produce satisfactory results, Whitney would go ahead. Thus it was that Whitney entered these three cities, despite the existence of another community antenna company there, on the recommendation of Jerrold that these other systems had little prospect of success. Absent any circumstances which indicate improper purposes on the part of Jerrold, these actions are perfectly legitimate.

Phil Hamlin was the Jerrold representative in the Northwest who handled its dealings with Whitney, as well as its sales in that area. In his sales efforts, he had encountered considerable resistance to Jerrold's full system and service contract sales program. In an effort to overcome this resistance and induce operators to purchase Jerrold equipment on its terms, Hamlin told several operators that if they did not purchase Jerrold equipment they would be faced with competition. These threats did not merely indicate that, if someone else was interested in installing a Jerrold system in the same community, he would back them, but rather indicated that he would take positive steps to secure a competitive system. The system operators in Wenatchee, Richland and Walla Walla were among those threatened by Hamlin in this manner. Jerrold relied on Hamlin in making its recommendations to Whitney. It is fair to infer that Hamlin's statements to Whitney and his superiors were designed to enable him to carry out his threats and did not represent a completely disinterested opinion. The successful picture produced by the initial operator in Wenatchee supports this conclusion. Ham-

lin also followed up his threats in Lewiston, Idaho, with a system backed by a group from Spokane. In addition, he made similar threats, all referring to backing by Whitney or eastern capital, to operators in Chehalis and Aberdeen, Washington, and Livingston, Montana, although Whitney never expressed an interest in these locations.

Hamlin's actions described above constitute most improper conduct. His ultimatum of buy Jerrold or be faced with competition backed by substantial resources was clearly intended to promote the sale of Jerrold equipment to the exclusion of the equipment of other concerns. The natural effect of such a campaign, if successful, would be to create a monopoly for Jerrold in the Northwest. Hamlin must be found to have intended the natural consequences of his actions and his intent can be attributed to Jerrold Northwest, since he was acting in his capacity as an officer of that corporation. The court feels that this intent need not be imputed to any of the other defendants, however. While Jerrold Northwest was an agent of Jerrold and the latter was responsible for its wrongs under the doctrine of respondeat superior, the agent's intent is not imputed to its principal. There is nothing in the record to indicate that any of the other corporate defendants had knowledge of Hamlin's threats and condoned his conduct. Thus, the court concludes that Jerrold Northwest did attempt to create a monopoly in the market for community television antenna equipment in its sales territory [52] in violation of § 2 of the Sherman Act. It also concludes that the intent evident from Hamlin's conduct can only be imputed to Jerrold Northwest, Milton Shapp and Jerrold Electronics Corporation and not to any of the other defendants.[53]

---

52. Washington, Oregon, Idaho and Western Montana.

53. Plaintiff's requests for findings of fact Nos. 126–143, 145–147, 149–156, 158, 159, 161–164, 166–171, 177–180, 173 & 174 (except that the words "representa-

tives of the defendants" should be deleted in the latter two requests) and defendants' requests for findings of fact Nos. 59–65 and 68 are not inconsistent with the facts set forth under this subheading. Many of these findings go into the transactions in question in more

### V-B.  Misuse of Patents.

On April 29, 1954, Jerrold acquired the Kallman Patent (Patent No. 2,394,917) covering the master antenna principle employed in community television antenna systems.[54]  In May of that year, the managers of Jerrold affiliated companies and Jerrold's sales engineers were informed of this fact and told that Jerrold planned to enforce its rights under the patent by requiring all new systems to be licensed.  People purchasing Jerrold equipment would automatically be licensed, while those using non-Jerrold equipment would be charged a fee.  They were told that the income from these licenses would be used to expand Jerrold's school program, which would be opened to personnel from all licensed systems.  The information and forms necessary to implement this program were to be passed on to the sales force as soon as they were available.  This plan was the subject of unfavorable comment from Jerrold's salesmen and representatives of various branches of the industry.  As a result, Jerrold informed its sales force on June 8, 1954, that it had decided not to put the plan into operation.

The requisite monopolistic intent cannot be gleaned from Jerrold's decision to enforce its patent in the manner outlined.  It would, of course, be possible for Jerrold to issue licenses in a way which would unfairly discriminate against the equipment of other manufacturers.  The limited action taken by Jerrold under this plan before it was abandoned does not indicate that any scheme of this sort was contemplated.  The record establishes that several salesmen did mention the patent in the course of their negotiations with potential customers.  Except for the two instances discussed below, however, there is no indication that anything was said from which it could be inferred that Jerrold intended to use the Kallman Patent for improper purposes.[55]

One Foscoe Hendrick testified that a Jerrold salesman tried to pressure him into buying Jerrold equipment, stating that they owned patents and if he bought non-Jerrold equipment, he might get himself in trouble.  Hendrick bought the other equipment anyway.  In addition, the defendants admit that Shapp told representatives of a company planning on installing a system in Victoria, Texas, that Jerrold would take whatever action was necessary to enforce its patent position, when he learned that they decided not to continue under a WK–1 contract they had signed with Jerrold after the field survey had been conducted and intended to use Entron equipment.[56]  While Shapp's remarks were ill-considered, they do not appear to have been motivated by a desire to restrain competition but by his keen disappointment at losing a system he thought he had sold.  The Victoria system was particularly important to Jerrold because it would have served as a showplace system in an area where the community television antenna industry was just getting started.  Furthermore, Shapp felt he had been treated discourteously by the Tele-tenna people and that Jerrold equipment had not been given fair consideration.  The fact that Shapp was piqued does not excuse his improper threat, but does explain away

detail than the court deems necessary, but they are basically correct.

54. The validity of this patent has never been tested.

55. See testimony of J. Hastings (N. T. 2566), K. Crawford (N. T. 793–5), and defendant Shapp's letter to G. Morrell (Exhibit P–17, p. 6, par. 6).  The defendants have not been shown to be responsible for the remarks attributed to an attorney for a group competing with Crawford for the Farmington, N. M., franchise.  Also, there is no evidence in the record of the existence of the facts set forth in plaintiff's request for finding of fact No. 212.  The testimony was properly admitted only for the limited purpose of showing Mr. Morrell's state of mind (N. T. 654).

56. It would seem that the Tele-tenna Corp. was acting within its rights in terminating the contract at that point (see p. 179, par. II, of Exhibit P–193) and that Shapp was not reasonable in his belief that it had breached the contract.

any inference of monopolistic intent. This is particularly so in view of the fact that he was shown to have made a threat in only one instance. No continued practice along this line, such as that carried out by Phil Hamlin, was established.[57] The court feels compelled to conclude that the two isolated and unrelated threats uncovered by the Government are an insufficient basis on which to make a finding that any or all of the defendants intended to acquire a monopoly.[58]

## VI. Right to Injunctive Relief.

The defendants state that since they have abandoned the sales policies complained of for several years and no predatory practices have been shown since 1954, the Government is not entitled to injunctive relief. While the court found that the defendants did not abandon their sales policies because of the Government suit, it cannot say that this factor did not deter them from reinstituting these policies at a later date. In all their actions, defendants have ventured close to the brink. This extreme lack of caution prevents the court from concluding that there is no reason to believe that these practices would not be resorted to again in the future. United States v. W. T. Grant Company, 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303; I. C. C. v. Barron Trucking Company, 3 Cir., 1960, 276 F.2d 275; United States v. Aluminum Company of America, 2 Cir., 1945, 148 F.2d 416.[59]

### Conclusions of Law.

1. The court has jurisdiction over the parties and over the subject matter.

2. The policy of the defendants of selling Jerrold equipment on a full system basis and of selling Jerrold equipment only in conjunction with a service contract violated no provision of the antitrust laws at its inception.

3. The defendants have failed to satisfy their burden of proving the continuing existence of the facts necessary to the lawfulness of the policy of selling Jerrold equipment on a full system basis and of selling Jerrold equipment only in conjunction with a service contract.

4. The continuing understanding and agreement among the defendants and independent distributors and manufacturers' representatives, during at least part of the time such understanding and agreement was in effect, to refuse to sell separate items of Jerrold community antenna system equipment to system operators using equipment purchased from manufacturers other than Jerrold and to require operators and prospective operators of community systems to subscribe to Jerrold engineering services and to purchase Jerrold equipment exclusively as conditions of purchasing any Jerrold equipment constitues a combination and conspiracy in unreasonable restraint of interstate commerce in community television antenna system equipment in violation of § 1 of the Sherman Act (15 U.S. C.A. § 1).

5. The defendants' sales of community television antenna system equipment upon the condition that the purchaser subscribe to Jerrold engineering services and purchase their full requirements for system equipment from Jerrold, during some of the time sales on such conditions were made, constitute violations of § 1 of the Sherman Act (15 U.S.C.A. § 1).

---

57. See page 568 ff. of 187 F.Supp., supra. supra.

58. The court also finds nothing in the use made of the Arbeiter Patent from which such an intent can be reasonably inferred.

   Plaintiff's requests for findings of fact Nos. 182–7, 189–201, 203–5, 207–210 and 213–222 and defendant's requests for findings of fact Nos. 70–73, 76, and 77 are not inconsistent with the facts set forth under this sub-heading and the details are basically correct.

59. In addition to those already covered, the court also finds that plaintiff's requests for findings of fact Nos. 1–7, 231, 235 and 243–247 and defendants' requests for findings of fact Nos. 1–5, 14, 19, 24, 27, 30, 31, 53, 55, 85, 109–113, 123 and 124 are consistent with this opinion and basically correct. All requests for findings of fact inconsistent with this opinion are denied.

6. The defendants have contracted to sell and have sold community television antenna system equipment upon the unlawful condition and with the unlawful agreement and understanding that the purchaser thereof shall not use or deal in similar equipment manufactured by their competitors with the effect of substantially lessening competition and tending to create a monopoly in interstate trade and commerce in community television antenna system equipment in violation of § 3 of the Clayton Act (15 U.S.C.A. § 14).

7. The written service contracts or oral understanding and agreements between defendants and operators of community systems that said operators not install as part of their systems any equipment not approved by Jerrold violated no provisions of the anti-trust laws.

8. The provision in the 103 series contracts, whereby community system operators agreed to use only Jerrold equipment to increase the number of channels received and distributed by their systems up to three channels, has the effect of foreclosing competitors of the defendants from a substantial market in violation of § 1 of the Sherman Act (15 U.S.C.A. § 1) and § 3 of the Clayton Act (15 U.S.C.A. § 14).

9. The line of commerce affected in the violation by defendants of § 3 of the Clayton Act is the total demand by operators of community television antenna systems throughout the United States for community system equipment.

10. The effect of each of the acquisitions by the defendant Jerrold of community television antenna systems and the cumulative effect of the entire series of said acquisitions is to foreclose competitors of the defendants from a share of the market in community television antenna system equipment. The effect of any future acquisitions may be to substantially lessen competition and to tend to create a monopoly in the sale and distribution of said equipment in various sections of the United States in violation of § 7 of the Clayton Act (15 U.S.C.A. § 18).

11. The line of commerce affected in the violation by defendants of § 7 of the Clayton Act is the total demand throughout the United States for community television antenna equipment.

12. None of the activities of the defendants disclosed in the record (except Jerrold Northwest to the extent indicated below) constitute a conspiracy or attempt to monopolize interstate trade and commerce in community television antenna equipment in violation of § 2 of the Sherman Act (15 U.S.C.A. § 2).

13. The threats of Philip Hamlin, while Vice President of Jerrold Northwest, to install and the installation of competing community television antenna systems in those communities in which operators or prospective operators of community systems refused to purchase Jerrold equipment upon its terms had the effect of forcing such operators to discontinue the construction or operation of such systems and depriving competing manufacturers of equipment of existing and potential customers and constituted an attempt to monopolize interstate trade and commerce in community television antenna system equipment in that company's sales area in violation of § 2 of the Sherman Act (15 U.S.C.A. § 2).

14. The market which was the subject of the attempt to monopolize by the defendant Jerrold Northwest is the total demand by operators of community television antenna systems for community system equipment in Washington, Oregon, Idaho and Western Montana.

15. In addition to the foregoing, the court affirms and adopts plaintiff's requests for conclusions of law Nos. 1–5 and 7–12 and defendants' requests for conclusions of law Nos. 2, 3, 17 and 23.

16. The plaintiff is entitled to an injunction with respect to the violations found in conclusions Nos. 4–6, 8, the last sentence of 10, and 13 above. Plaintiff is not entitled to an order requiring that the defendant Jerrold Electronics Corporation divest itself of the ownership of the community systems it has ac-

quired to this date, as listed in plaintiff's request for finding of fact No. 226.

17. All requests for conclusions of law inconsistent with the foregoing are denied.

The plaintiff is instructed to submit a form of decree in accordance with this opinion within three weeks. The defendants have two weeks after receipt of plaintiff's suggested decree within which to submit any comments they may have.[60]

### Final Judgment.

The plaintiff, United States of America, having filed its complaint herein on February 15, 1957, and its amended complaint on April 2, 1959; the defendants having appeared and filed their answers to such complaint; the issues having been tried from November 9 to December 18, 1959; the court having entered its findings of fact and conclusions of law together with its opinion on July 25, 1960 (Document No. 58), which has been supplemented by the Memorandum Opinion of October 10, 1960; and it appearing to the court that there is no just reason for delay in entering a final judgment, it is hereby

Ordered, adjudged and decreed as follows:

#### I.

The court has jurisdiction of the subject matter hereof and of the parties hereto. The defendants have (a) combined and conspired to insist on service contracts and to sell only full systems in order to restrain trade and commerce in community television antenna equipment in violation of Section 1 of the Sherman Act (15 U.S.C.A. § 1); (b) have contracted to sell and have made sales of equipment for community television antenna systems upon unlawful conditions in violation of Section 3 of the Clayton Act (15 U.S.C.A. § 14); and (c) defendant Jerrold has made acquisitions of community television antenna systems, the effect of which has been to foreclose competitors of the defendants from a share of the market in community television antenna system equipment and if future acquisitions are not enjoined the effect of any further acquisitions may be to substantially lessen competition and tend to create a monopoly in the sale and distribution of said equipment in various sections of the United States in violation of Section 7 of the Clayton Act (15 U.S.C.A. § 18); and (d) defendant Jerrold-Northwest, Inc., has attempted to monopolize trade and commerce in violation of Section 2 of the Sherman Act (15 U.S.C.A. § 2).

#### II.

(A) "Person" shall means a corporation, partnership, individual, association or any other legal entity;

(B) "Community television antenna system" shall mean any system for the reception of television signals and their transmittal throughout a community;

(C) "Equipment" shall mean any equipment designed for use as part of or in conjunction with a community television antenna system, including parts thereof, and shall include, but not be limited to, antennas, head end equipment, amplifiers, filters and traps, automatic gain control devices, converters, test equipment, and tap-off units;

(D) "Jerrold equipment" shall mean any equipment manufactured or sold by any defendant;

(E) "Services" shall mean engineering and technical services relating to the

---

60. The following briefs and memoranda have been submitted to the court in regard to this matter and have been filed with the Clerk in a single envelope marked Document No. 56: Plaintiff's trial brief, defendants' trial brief, plaintiff's memoranda re (a) prayer for injunctive relief, (b) defense that acquisitions were solely for investment, and (c) defense of failing financial condition, and plaintiff's letter of April 22, 1960, concerning the relevant market. In addition, the following documents have been filed: Plaintiff's requests for findings of fact and conclusions of law (Document No. 51), defendants' requests for findings of fact and conclusions of law (Document No. 54), and plaintiff's objections and comments concerning defendants' requests (Document No. 55).

planning, installation, testing, maintenance, repair or enlargement of community television antenna systems;

(F) "Jerrold services" shall mean any services furnished by any defendant;

(G) "Defendants" shall mean the defendants Jerrold Electronics Corporation, National Jerrold Systems, Inc., Jerrold-Northwest, Inc., Jerrold-Southwest, Inc., Jerrold-Ohio, Inc., Jerrold Mid-Atlantic Corporation, and Milton Jerrold Shapp, and each of them.

### III.

The provisions of this final judgment applicable to any defendant shall apply to such defendant, its officers, directors, agents, employees, successors, and assigns and to those persons in active concert or participation with such defendant who receive actual notice of this final judgment by personal service or otherwise.

### IV.

(A) Each of the defendants is ordered and directed, within 45 days from the date of entry of this final judgment, to:

(1) Terminate and cancel any and all provisions of each of their contracts with any community television antenna system operator which are or may be contrary to or inconsistent with any of the provisions of this final judgment;

(2) Mail a copy of this final judgment to each person to whom such defendant has sold equipment or with whom such defendant has a service contract.

(B) Each of the defendants is ordered and directed:

(1) Within 65 days from the date of entry of this final judgment, to file with the Clerk of this court, with a copy to the Attorney General, an affidavit setting forth the fact and manner of compliance with subsection (A) of this Section IV;

(2) For a period of three years from the date of entry of this final judgment, to furnish a copy of said judgment to any person making written request therefor.

### V.

The defendants are enjoined and restrained from, directly or indirectly:

(A) Selling or offering to sell equipment on the condition or understanding that the purchaser thereof purchase services from the defendants;

(B) Furnishing or offering to furnish services on the condition or understanding that the recipient thereof purchase any Jerrold equipment;

(C) Selling or offering to sell any item of Jerrold equipment on the condition or understanding that the purchaser thereof buy or use any other Jerrold equipment;

(D) Selling or offering to sell any equipment on the condition or understanding that the purchaser thereof will not purchase or use equipment manufactured or sold by any other person; provided, however, this subsection (D) shall not prohibit defendants from electing to sell or offer for sale Jerrold equipment upon the condition or understanding that defendants will not guarantee, warrant or, in any manner, be responsible for, the operation or efficiency of such equipment, or the system in which the same may be installed or used, if the purchaser thereof installs, as a part of such system, any equipment or attachments manufactured by any other person which, in defendants' opinion, might either (a) impair the quality of television reception or signal distribution capability of the system, or (b) cause damage to, or impair the operation or efficiency of, any of the Jerrold equipment sold or offered for sale. In the event the defendants elect to sell, or offer for sale, Jerrold equipment upon the foregoing condition or understanding, defendants shall prepare a complete list of each item of equipment manufactured by defendants and setting forth in such list, opposite each item of Jerrold equipment, the item or items of equipment equivalent thereto manufactured or sold by others and which, in the opinion of the defendants, may be used in conjunction or connection with Jerrold

equipment and which will not impair the quality of television reception or signal distribution capability of the system and will not cause damage to or impair the efficiency of Jerrold equipment used in the system. And provided further that defendants shall keep such list current and up to date until such time as defendants notify the plaintiff in writing that they no longer wish to avail themselves of the election specified in this subparagraph (D).

(E) Requiring, urging, or influencing their distributors or sales representatives:

(1) To refuse to sell any item of Jerrold equipment to persons using equipment manufactured or sold by persons other than Jerrold;

(2) To require, as a condition for the sale of Jerrold equipment,

(a) that the purchaser thereof subscribe to Jerrold services, or

(b) that the purchaser thereof buy any additional Jerrold equipment.

## VI.

The defendants are enjoined and restrained, until April 2, 1962, from acquiring, directly or indirectly, any shares of the stock or assets of, or any controlling, ownership or managerial interest in any community television antenna system already built at the time of the proposed acquisition, except (1) with the approval of the plaintiff or (2) after an affirmative showing to the satisfaction of this court, upon not less than 10 days' notice to the plaintiff, that the effect of such acquisition will not be substantially to lessen competition or tend to create a monopoly in the manufacture, distribution or sale of equipment.

## VII.

The defendants are enjoined and restrained from coercing or forcing or attempting to coerce or force any person to buy Jerrold equipment or services by threatening to build or assist others in building a competing community television antenna system or by any other threats of economic or other reprisal.

## VIII.

For the purpose of securing compliance with this final judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted (1) access during the office hours of such defendant to those books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the defendant which relate to any of the subject matters contained in this final judgment, and (2) subject to the reasonable convenience of the defendant and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present.

Any defendant, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, made to its principal office, shall submit such written reports with respect to any of the matters contained in this final judgment applicable to such defendant as from time to time may be necessary for the enforcement of this final judgment.

No information obtained by the means provided in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized employee of the Executive Branch of the plaintiff, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this final judgment or as otherwise required by law.

## IX.

Jurisdiction is retained for the purpose of enabling any party to this final judgment to apply to this court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this final judgment, for the modifica-

tion of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

### X.

Judgment is entered against the defendants for all costs to be taxed in this proceeding.