**DEHYDRATING PROCESS COMPANY,**
Plaintiff, Appellant,

v.

**A. O. SMITH CORPORATION,**
Defendant, Appellee.

No. 5814.

United States Court of Appeals
First Circuit.

Heard June 6, 1961.

Decided July 13, 1961.

---

**4.** Wewoka Petroleum Corporation v. Gilmore, Okl., 319 P.2d 285, 291; Monzingo v. Bowers, 135 Okl. 225, 275 Pac. 339, 340–341.

Ralph Warren Sullivan, Boston, Mass., with whom James M. Malloy, Morton Myerson, Harry Bergson, Jr., Malloy, Sullivan & Myerson and Bergson & Wolf, Boston, Mass., were on brief, for appellant.

John M. Harrington, Jr., Boston, Mass., with whom James N. Johnson and Porter, Lauritzen, Quale, Porter & Zirbel, Milwaukee, Wis., and Ropes & Gray, Boston, Mass., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This private treble-damage action under section 4 of the Clayton Act, 15 U.S.C.A. § 15, resulted in a directed verdict in favor of the defendant at the close of the evidence. Defendant urged a number of grounds. Only one, which goes to the heart of the matter, need be considered.

Defendant-appellee, a New York corporation with a factory in Wisconsin, is a national manufacturer of storage equipment; inter alia, a patented glass-lined silo, and a patented unloading device, hereinafter unloader. The unloader is a sweep-arm, installed inside at the bottom of the silo, which, when operated, directs the settling stored material out through a slot in the base. From 1951 through 1957, if requested, defendant sold its unloader separately from its silo. In 1958, allegedly because of complaints by customers who had purchased separate unloaders, defendant adopted a policy of not selling unloaders unless they were to be installed in presently-purchased, or already-owned [1] silos of its own manufacture. Plaintiff contends that this was a tie-in sale violative of section 3 of the Clayton Act, 15 U.S.C.A. § 14.[2]

Plaintiff-appellant, a Massachusetts corporation, is engaged in the manufacture of fish products, including fish meal, a dry, granular material, and homogenized condensed fish, a liquid. Fish meal was formerly sold in bags, but customers came to wish it in bulk. This presented a storage problem. Plaintiff employed a management consultant engineer, who recommended defendant's unloader and silo.[3] Because the silo was not watertight it could not be used to store homogenized fish. In order to gain flexibility plaintiff decided to use defendant's unloaders, but with water-tight tanks so that if it should have an increase in its homogenized fish business and a decrease in fish meal it could remove the unloaders, plug up the bottom of the tanks, and use them to store the liquid fish product. It made a package contract with the G.A.T. Corporation for four of defendant's unloaders, to be installed by G.A.T. in four G.A.T. tanks. When G.A.T. ordered unloaders from defendant to complete this contract, defendant informed it of its new policy and refused to sell. Plain-

1. Defendant's silos were demountable, and there was some evidence of a second-hand market therein. The defendant did not have the reverse policy, that customers to whom it sold silos must purchase or use its unloaders.

2. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for [the] sale of goods, * * * whether patented or unpatented, * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the lessor or seller * * * *"

Because defendant would sell an unloader without its silo if the purchaser already had one, it is apparent that this was not strictly a tie-in sale policy. Whatever consequences this may have, we do not hold that this makes the statute inapplicable.

3. It is not insignificant that plaintiff's engineer advised the use of both together even before he knew of defendant's policy requiring it.

tiff permitted G.A.T. to rescind its contract. It then, through an intermediary, acquired four of defendant's unloaders and silos. Subsequently plaintiff suspended the manufacture of fish meal and increased its homogenized fish business. It sued defendant, claiming damages because defendant's units were more expensive than the G.A.T. combination, because loss of its G.A.T. contract occasioned an installation delay, and because it does not now have the alternative homogenized fish storage that the combination it preferred would have permitted.

In United States v. Jerrold Electronics Corp., D.C.E.D.Pa.1960, 187 F.Supp. 545, at page 559 in a well-considered opinion in a case involving a TV aerial system, Judge Van Dusen stated,

> "The difficult question raised by the defendants is whether this should be treated as a case of tying the sale of one product to the sale of another product or merely as the sale of a single product. It is apparent that, as a general rule, a manufacturer cannot be forced to deal in the minimum product that could be sold or is usually sold. On the other hand, it is equally clear that one cannot circumvent the anti-trust laws simply by claiming that he is selling a single product. The facts must be examined to ascertain whether or not there are legitimate reasons for selling normally separate items in a combined form to dispel any inferences that it is really a disguised tie-in."

The court went on to say that the parts to the aerial system there involved could not normally be said to be a single product. It nevertheless held that the Clayton Act was not violated during the period for which justification from a business standpoint—apart from an illegal purpose—was shown for insisting upon a combination sale. It placed the burden of justification upon the defendant.[4]

We think the principle recognized by the district court in Jerrold, that a proper business reason may justify what might otherwise be an unlawful tie-in, is sound. Although plaintiff cites International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, we find its language, instead, favorable to the defendant. It is true that the defendant there was foreclosed from proving that the requirement that only its own salt be used in its machines was "reasonable," but examination discloses that this was because its proffered proof did not go far enough. The court said, in 332 U.S. at pages 397–98, 68 S.Ct. at page 16, "Of course, a lessor may impose on a lessee reasonable restrictions designed in good faith to minimize maintenance burdens and to assure satisfactory operation. * * * But it is not pleaded, nor is it argued, that the machine is allergic to salt of equal quality produced by anyone [else and] * * * it is admitted that, at times, at least, competitors do offer such a product." This seems a clear implication that if other appropriate salt was not available defendant might have insisted upon the use of its own.

We may agree with the plaintiff that the compulsory joining of two "separate" articles is a per se violation of the act. This statement, however, solves nothing. Articles, though physically distinct, may be related through circumstances. The sound business interests of the seller or, phrasing it another way, a substantial hardship apart from the loss of the tie-in sale may be such a circumstance. It would not be thought, for example, that a one-legged man could insist on purchasing only a left shoe. Whatever may be meant by per se, we must first consider what may be fairly treated by a seller as inseparable. See, in general, Turner, The Validity of Tying Arrangements under the Antitrust Laws, 72 Harv.L.Rev. 50, 68–72 (1958).

4. Jerrold was affirmed, per curiam, 1961, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, but the appeal involved only the district court's finding of illegality for the period that the defendant-appellant failed to prove justification.

From 1951 to 1957 the defendant sold eighty unloaders to thirty-six customers who did not use its silos. Eighteen of these customers made claims, and six unloaders were taken back for refund.[5] The principal reasons for the complaints were that, in spite of defendant's educational efforts, its customers did not install the unloaders in containers having correct mechanical tolerances, or that their containers lacked a sufficiently slippery inside surface, comparable to defendant's glass lining, to allow their particular material to have the gravity down-feed needed to permit the unloader to function. It may be assumed, however, that defendant did not readily escape claims, or the consequent injury to its reputation, by telling its customers that the fault was theirs.

█ It is true that this evidence came from defendant's witnesses. Some, however, was introduced by the plaintiff as part of its case, and none was in any way impeached or contradicted. For purposes of a directed verdict the court was warranted in considering it.[6]

█ The plaintiff contends that even if the principle of business justification is sound, it was for the jury to decide whether defendant's ground for claiming it was sufficient. We find no jury question. We believe the court was warranted in accepting defendant's uncontroverted evidence as inherently reasonable, and in holding a record of 50 per cent dissatisfied customers over a seven-year period a matter too substantial to be disregarded. Particularly was this so with respect to this plaintiff, whose engineer informed defendant at the outset that fish meal presented special unloading difficulties.[7] Therefore at the least it was reasonable

---

5. While complaints were received also from customers who used defendant's unloaders in defendant's silos, these were "to a considerably lesser degree." Defendant offered its records to permit detailed inquiry into this subject, but plaintiff did not pursue it. We accordingly accept this generalization at its face value.

6. All courts of course agree that on a motion for a directed verdict the evidence must be "viewed" most favorably to the opposing party. Less often, however, is the question articulated whether the field of vision encompasses in any degree uncontradicted evidence introduced by the movant. In Wilkerson v. McCarthy, 1949, 336 U.S. 53, 57, 69 S.Ct. 413, 93 L. Ed. 497, the court held that such evidence could not be regarded. This, however, was a FELA case, and it is perhaps justifiable to consider such cases on their own bottom, see, e. g., Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, at least if there are current common-law decisions to the contrary. In Pence v. United States, 1942, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510, the defendant was held to have established an affirmative defense as matter of law by introducing evidence which the court held to be "no way improbable" (id. 316 U.S. at page 339, 62 S.Ct. at page 1084), and which being uncontradicted, it regarded as "overwhelming" (id. 316 U.S. at page 350, 62 S.Ct. 1080). See also the earlier leading case of North Pennsylvania R. R. v. Commercial Bank, 1887, 123 U.S. 727, 8 S.Ct. 266, 31 L.Ed. 287 (verdict directed for plaintiff where "no conflict in the evidence.") We do not appear to have considered this question ourselves, but a number of other circuits have reached this result without even discussion. See, e. g., Rhodes v. Metropolitan Life Insurance Co., 5 Cir., 1949, 172 F.2d 183, certiorari denied 337 U.S. 930, 69 S.Ct. 1495, 93 L.Ed. 1738; Brunner v. Minneapolis, St. P. & S. Ste. M. Ry., 7 Cir., 1957, 240 F.2d 608, 609; Norfolk Southern Ry. v. Davis Frozen Foods, Inc., 4 Cir., 1952, 195 F.2d 662. In the last case, in directing in favor of the plaintiff, the court said, 195 F.2d at page 665, "The fact that the burden of this issue rested upon the plaintiff is immaterial; for the rule is well settled that the court, upon request, should direct a verdict in favor of the party having the burden of proof if the evidence establishes the facts in his favor so clearly that reasonable men could entertain no doubt with regard thereto." See, in general, Blume, Origin and Development of the Directed Verdict, 48 Mich.L.Rev. 555, 581–82 (1950).

7. He wrote, "In storage [fish meal] becomes somewhat cakey and will bridge." This we take to mean that if there is frictional support at the tank walls, the meal will form arches instead of falling, a condition which would prevent the unloader from operating.

for the defendant to have insisted upon the use of a tank or silo which met the specifications it had found necessary. Cf. Emsig Manufacturing Co. v. Rochester Button Co., D.C.S.D.N.Y.1958, 163 F. Supp. 414.[8] As we have had occasion to observe before, see Brown v. Western Massachusetts Theatres, Inc., 1 Cir., 1961, 288 F.2d 302, 305, the antitrust laws do not require a business to cut its own throat.

If containers were made by others to defendant's essential specifications,[9] that portion of defendant's policy which required the use or purchase of its own silos as distinguished from such others may well have been improper. But it is not such impropriety of which plaintiff complains. This is not a government suit testing the broad aspects of defendant's conduct, but a private action in which the plaintiff seeks, and must establish, its damages. A consumer may well be damaged by antitrust violations requiring him to make a purchase on terms that he does not wish, cf. Chattanooga Foundry and Pipe Works v. City of Atlanta, 1906, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, but he has the burden of proving that he was wrongly affected. This the plaintiff has failed to do. It has not shown that defendant charged an unreasonable price, or that an equivalent product might have been obtained for less. Plaintiff's only damage came from having to meet defendant's specifications with respect to its storage containers. Since this requirement has been demonstrated to be reasonable, plaintiff has suffered no compensable loss.

Judgment will be entered affirming the judgment of the District Court.

8. It is true that Emsig and International Salt involve leases rather than sales, and that a lessor, particularly one having a maintenance obligation, has a special interest to protect. However, legitimate economic interest does not necessarily depend upon title. We cannot agree with the suggestion by Turner, op. cit. supra at 64, that a case such as the one at bar can be disregarded because it would be rare. We do not believe that a manufacturer can be compelled to sell something under circumstances requiring it to issue a caveat, "We will not give our usual warranties, because we know your proposed specifications are not going to work."

9. Unlike International Salt, the record is bare on this subject. We need not decide in this case where the burden of proof lies.