**TELEFLEX INDUSTRIAL PRODUCTS, INC., Plaintiff,**

v.

**BRUNSWICK CORPORATION, Defendant.**

Civ. A. No. 68–1730.

United States District Court E. D. Pennsylvania.

Oct. 29, 1968.

Matthew J. Broderick, Dechert, Price & Rhoades, Philadelphia, Pa., for plaintiff.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## OPINION

JOHN MORGAN DAVIS, District Judge.

Before the Court is a motion for a preliminary injunction, 15 U.S.C. § 26. The underlying cause of action is asserted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. The latter statute which is directed *inter alia* against tying agreements, states in relevant part that: * * *.

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale * * * on the condition, * * * that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor * * *, where the effect of such lease [or] sale * * * may be to substantially lessen competition * * *.

## BACKGROUND

The plaintiff is a corporation which manufactures instrument panels for the marine pleasure craft market. These panels contain three general categories of instruments and equipment. The first category consists of instruments designed to monitor the operation of a boat propulsion system, such as the ammeter, tachometer, oil pressure indicator and temperature gauge.

In addition, a typical panel as installed in a pleasure craft will contain instruments of the second category, which are required principally by consumer demand, and which are not operationally essential, such as the speedometer, fuel guage, flow meter (continuous measurement of fuel consumption) and hour meter.

Finally, the third category of equipment which an instrument panel contains consists of a group of switches. The ignition switch is the most essential and critical from the standpoint of operational reliability. A typical panel manufactured by the plaintiff may also contain switchers to operate lights, bilge pumps, blowers and horns.

Although the plaintiff has been manufacturing and distributing instrument panels since about 1962, it recently entered into the "customized" instrument panel market. The customized panel is so named, because it is manufactured to the design specifications of each boat builder. Thus, a typical boat builder may desire to include "full instrumentation" in a more expensive model, while perhaps prescribing a more spartan panel for his modestly priced line. The plaintiff would then manufacture the instrument panels in accordance with the size, color, instrumentation and switch array as required by each boat builder.

Similarly, additional panels or panel designs may be dictated by the boat builder, if the craft is to be equipped with a flying bridge, or if the craft is to be propelled by dual engines.

The Kiekhaefer Mercury Division of the defendant Brunswick Corporation has manufactured marine propulsion systems since about 1938, in three basic configurations—inboard, outboard and stern drive.

In this action we are concerned only with the latter. The stern drive utilizes an inboard engine mounted in the aft section of the craft with power transmitted to the propeller by way of a "stern drive" or outboard unit, which is located outside the craft, through an opening in the transom. This system is said to incorporate the stability and reliability of an inboard system, with the maneuverability and efficiency of the outboard system.

The defendant started manufacturing and marketing the stern drive system in about 1962, under the "MerCruiser" trade name. Today, it is the largest and dominant manufacturer of this type of system, with at least 50% of the total sales of stern drives of the United States, which is the relevant market. In 1967, this market consisted of about 46,000 units, representing total sales of about $60,000,000. Three other major manufacturers—Outboard Marine Corp., Chrysler Corp. and Eaton, Yale and Towne, Inc. have approximately 33%, 8% and 8% of the market respectively. The selling prices of MerCruiser stern drive systems range from $1978.63 for the 120 horsepower model, to $4133.-18 for the 325 horsepower model. Eight models are listed in their 1968 price list (D 21).[1]

### THE CONTROVERSY.

Recently, the defendant began rigorously enforcing a "policy" which required purchasers of its MerCruiser stern drive unit to also purchase its instrument panel. Although the defendant claims that it has always sold its inboard-outboard engines as a "package", which included the instrument panels, the existence of this policy was substantially discredited by numerous witnesses.

The plaintiff contends that this policy as presently enforced exemplifies a classic tying agreement, expressly proscribed by Section 3 of the Clayton Act, 15 U.S.C. § 14. To justify its policy, the defendant essentially asserts that the technological interdependence between the engine and the instruments which monitor the operation of the engine (listed in the first category above) justified their inclusion in the "package", as an integral part of the stern drive system. Very persuasively, the defendant has demonstrated that the failure of any one of the four critical monitoring instruments,[2] could ultimately result in a malfunction or failure of the engine. When this occurs, the ultimate consumer will look to Kiekhaefer Mercury for appropriate redress. The instrument manufacturers, boat builder, or dealers are neither qualified nor necessarily interested in isolating and rectifying the malfunction. Thus, in order to protect its goodwill, reputation, and ultimately its position of dominance in the industry, the defendant prefers to market the instrument panel as an inte-

---

[1]. The original equipment manufacturer (OEM) prices, e.g., to boat builders, are $1095.00 and $2280.00, respectively.

[2]. In addition to the four instruments listed in the first category, the engine ignition switch must also be considered "critical".

gral part of the stern drive system, thereby assuring that all critical instrumentation is mechanically and functionally compatible, and of comparable quality with the engine itself.[3]

### PRELIMINARY INJUNCTION.

As this Court set forth in an earlier decision, in order to prevail the plaintiff must demonstrate:

(1) that the conduct to be enjoined is in furtherance of the alleged violations of the Sherman [and Clayton] Act[s];
(2) that there is substantial likelihood the allegations of the complaint will be sustained at the trial of the cause;
(3) that irreparable harm to the plaintiff will result if the injunction pendente lite is denied.[4]

McKesson & Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743, 746 (E.D.Pa. 1964); Kontes Glass Co. v. Lab Glass, Inc., 373 F.2d 319 (3rd Cir. 1967).

■ As previously stated, the essence of the defendant's justification for tying in the sale of the instrument panel with stern drive unit,[5] is the "technological interdependence" between the two. Absent this justification, there is little doubt that the requirement for concurrent purchase would constitute a classic tying agreement, proscribed by Section 3 of the Clayton Act. See International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1935); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Times-Picayune Publishing Co. et al. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). However, it is equally clear that the desire to preserve goodwill may constitute sufficient justification for maintaining a tying agreement. See e. g. Susser v. Carvel Corp., 332 F.2d 505, 519 (2nd Cir. 1964).

■ The more difficult problem is whether the plaintiff has demonstrated a substantial probability (or likelihood) that it will ultimately prevail at trial. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2nd Cir. 1953); Railroad Yardmasters of America v. Pennsylvania R. R. Co., 224 F.2d 226 (3rd Cir. 1955). This requires us to ascertain "whether or not there are legitimate reasons for selling normally separate items[6] in a combined form." United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 559 (E.D.Pa.1960),[7] or whether it is merely a disguised restraint on free competition. Emsig Manufacturing Co. v. Rochester Button Company, 163 F.Supp. 414 (S.D.N.Y.1958).

---

3. The defendant will market the basic instruments either in panel configuration, i.e. mounted on a "board", or in "cluster" form, i.e. the individual unmounted instruments, suitable for mounting in whatever panel the boat builder is utilizing.

4. Unlike *McKesson & Robbins*, supra, there has been no allegation of "unclean hands" on the part of the plaintiff, in the instant case.

5. In its "1969 MerCruiser Fall Discount Program" dated July 15, 1968 which precipitated the prosecution of this lawsuit to a great extent, the defendant included the following components in its "Stern Drive Power Package."
 1. Engine
 2. Transom Plate Assembly
 3. Instrument Panel and Harness Assembly
 4. Stern Drive Unit and Power Trim
 5. Exhaust Kits and Water Pickups Kits

6. Power Trim Control and Harness Assembly
See exhibit 1 to complaint.

6. We shall assume, for the purposes of the preliminary injunction, that the instrument panel is a "normally separate item". This is justified, since it has been asserted, without contradiction, that several other manufacturers of stern drive units do not require simultaneous purchase. In addition there is some indication that the defendant itself has permitted OEM accounts to return instrument panels for credit. See plaintiff's answers to Interrogatories (document 8), No. 3. Finally certain boat manufacturers testified that they considered them as separate items.

7. Affirmed, per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

There can be little question that the defendant has adequately shown that there is a definite interrelationship between the efficient operation of its engine, and the instruments which are required to monitor that operation.

■ In addition, the defendant has shown that primarily its goodwill (and customer satisfaction) would suffer as the result of a malfunctioning instrument which ultimately damages a Mer-Cruiser engine. Although there have been no examples presented by either side of specific incidents of engine failure resulting from the plaintiff's instruments malfunctioning, there is ample indication that if and when this may occur, the delineation of responsibility between the plaintiff and defendant regarding who will ultimately bear the liability is far from clear, thus resulting either in customer dissatisfaction, or in the defendant assuming a disproportionate share of the liability, rather than jeopardize its consumer goodwill. As a corollary to this observation, the defendant has demonstrated in a cursory manner (but adequately for the purposes of opposing a preliminary injunction) that its instrument panel and ancillary harnessing equipment is of a higher quality than the plaintiff's. This is not simply a matter for resolution in the "marketplace" as the plaintiff suggests, but is directly related to the question of the reasonableness of the tying agreement. It is an established principle that a proper business reason may justify "what might otherwise be an unlawful tie-in." Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653 (1st Cir. 1961).

The requirement for showing irreparable harm has been adequately fulfilled for reasons set forth in p. 7 and 8 of plaintiff's brief, which are hereby incorporated into the Court's findings of fact.

■ Although the motion for a preliminary injunction is denied, we do not wish to infer that the plaintiff's cause is without merit. The defendant's assertion of "technological interdependence" has been subjected to formidable attack by the plaintiff in several instances. This denial is therefore based principally upon a question of degree, rather than substance. It is clear that the plaintiff must show a likelihood that it will prevail. It is a condition precedent for granting a preliminary injunction, Automatic Radio Mfg. Co. v. Ford Motor Co., 242 F.Supp. 852 (D.Mass.1965). However, any doubts which the Court presently entertains regarding the merits of the *defendant's* contention are adequately reflected in the approved findings of fact.

■ For the aforementioned reasons, then, we hold that the defendant has preliminarily established a legitimate basis for continuing its tie-in sales. The motion for a preliminary injunction will accordingly be denied, but subject to the following conditions.

■ First, the defendant must take back for full credit or refund, all unused Kiekhaefer Mercury instrument panels which have been heretofore furnished to OEM accounts, as part of its stern drive "package". This will include but not necessarily be limited to the Kiekhaefer Mercury instrument panels encompassed by the so-called indemnity agreements negotiated by the plaintiff with various OEM accounts.

In so ordering, the Court recognizes that the so-called policy of the defendant regarding the contents of its stern-drive package is far from clear. It would indeed be inequitable to require the OEM accounts to retrospectively bear the burden of this decree since it is evident that the defendant itself has heretofore failed to actively and vigorously enforce its package-sales "policy".

■ Second, the defendant is enjoined from foreclosing and otherwise preventing the plaintiff from participating in "non critical" instrument and equipment sales to OEM accounts; (defined as the second and third category in this Opinion). Pending ultimate resolution of this action, the defendant is hereby required to supply its "critical" instruments to the plaintiff (e. g. in cluster form) at a competitive price for inclu-

sion in Teleflex customized instrument panels, if the plaintiff so desires.

This restriction is merely an implementation and clarification of the scope of the subject matter of this lawsuit, namely, the so-called critical instruments.

 Third, the defendant is required forthwith to promulgate to the plaintiff and other instrument panel manufacturers, the minimum acceptable standards and specifications for all instruments and instrument panels, to permit qualification of plaintiff's products with appropriate certification by defendant's engineering department, " * * * as having design characteristics suitable for use on the [MerCruiser] stern-drive product" set forth in the MerCruiser Stern Drive Power Package Warranty, (D. Ex. 1). In so ordering, we recognize that there is a middle ground which may ultimately form the optimum basis for relief. If the Court finds after trial on the merits, that there is indeed a technological interdependence between the aforementioned instruments and the MerCruiser engine, the tie-in sale may notwithstanding be proscribed, if the plaintiff can demonstrate that qualification of *its* instruments as conforming to Kiekhaefer Mercury standards could readily be accomplished. See International Business Machine Corp. v. United States, 298 U.S. 131, 139, 56 S.Ct. 701, 80 L.Ed. 1085 (1935); International Salt Co. v. United States, 332 U.S. 392, 393–398, 68 S.Ct. 12, 92 L.Ed. 20 (1947); United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 559–560 (E.D.Pa.1960).

This Court will retain jurisdiction pending ultimate resolution, for the purpose of enforcing the conditions set forth above.

In accordance with Federal Civil Rule 52(a) we enter the following:

## FINDINGS OF FACT.

Affirmed:

Plaintiff Nos. 1–7, 9, 10, 12, 15, 17, 19, 21, 22, 24(a)–(f), 25(a)–(f), 26(a)–(f), 27, 28(a) (b); 30–37, 39–58, 60, 62, 64, 67, 69, 70, 74.

Defendant Nos. 1–3, 5–7, 9–14, 17, 21, 24, 25, 28, 33.

Refused as stated:

Plaintiff Nos. 8, 13, 23, 29, 38, 59, 63, 66, 71, 72.

Defendant Nos. 4, 8, 15, 16, 18, 22, 23, 27, 29, 38.

Denied: Plaintiff Nos. 11, 14, 16, 18, 20, 65, 68, 73.

Defendant Nos. 19, 20, 26, 30, 31, 32, 34, 35, 36, 37.

## CONCLUSIONS OF LAW.

Affirmed:

Plaintiff Nos. 1, 3, 5–9, 13, 14.

Defendant Nos. 1, 3–5.

Denied: Plaintiff Nos. 2, 4, 10–12, 15.

Defendant No. 2.

———◆———

In any instance where there may be a lack of clarity in the approved requests, the language of the Opinion will govern.

It is so ordered.