**POLYTECHNIC DATA CORPORATION,**
a Delaware corporation, Plaintiff,

v.

**XEROX CORPORATION,** a New York
corporation, Defendant.

No. 70 C 3027.

United States District Court,
N. D. Illinois.

July 20, 1973.

**2**

Luther C. McKinney, David Aufderstrasse, Alan I. Greene of Chadwell, Kayser, Ruggles, McGee, Hastings & McKinney, Chicago, Ill., for plaintiff.

Max Wildman, Thomas D. Allen, Jerald P. Esrick, John J. Arado of Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on defendant's motion for Summary Judgment.

This suit is basically an Anti-Trust action brought under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 in order to prevent and restrain the violation by the defendant of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to compensate the plaintiff for damages arising out of such violations. The plaintiff also brings this suit as a diversity action against the defendant for the willful violation of common law principles of unfair competition and tortious interference with plaintiff's advantageous business relationships.

The plaintiff, Polytechnic Data Corporation ("Polytechnic") is a Delaware corporation with its principal place of business located in Chicago, Illinois. The plaintiff is engaged principally in the business of manufacturing and selling and/or leasing, throughout the United States and elsewhere, the "Copy Controller-Key", a device which controls and measures work being performed on all types of copying machines.[1]

The defendant, Xerox Corporation ("Xerox"), is a New York corporation transacting business in Illinois. It is alleged to be the dominant manufacturer and marketer of copying machines in the world.

---

1. The Copy Controller-Key contains six key slots each with its own meter. Once this device is installed on any copying machine, the Copier cannot make copies until a key is inserted into its corresponding slot and turned. At the same time plaintiff's device records on the meter to which that key is assigned the number of copies made by the insertion of that particular key. The Copy Controller-Key is of value to users of copying machines, for it enables them to control the amount of paper and toner used by the machines and the use of the machine and thereby to reduce the expense of the machine.

The plaintiff in the Complaint has alleged, *inter alia,* the following facts:

1. Plaintiff's Copy Controller-Key is of no value to the user unless and until it is installed on a copying machine. Installation consists of attaching several wires from the master unit controller key to the internal wiring of the copying machine by means of clip-on type devices. The installation of a Copy Controller-Key on a copying machine has no harmful effect upon the machine or upon the quality of the copies that the machine delivers.

2. Plaintiff believes that Xerox has an arrangement to purchase for resale a metering device known as "Auditron", which controls and measures the work performed by Xerox's copying machines. Plaintiff also believes that Xerox consciously refrains from actively selling, leasing or otherwise marketing its metering device because the use of any such metering device upon its machines allows the user to exercise control over the number of copies being made on the copy machine and to prevent the making of unauthorized and unnecessary copies on the machine.

3. Xerox has engaged in a nationwide combination with lessees of its machines to restrict the sale or lease of plaintiff's Copy Controller-Key device. This course of action has been initiated and carried out by Xerox, and many of the lessees of Xerox's machines have acquiesced in this course of conduct.

4. About October 1969, Xerox implemented an unlawful and malicious policy and course of conduct designed to prevent, and which has had the effect of preventing the plaintiff from marketing its Copy Controller-Key device to lessees of Xerox machines. This course of conduct was carried out in combination with lessees of Xerox's machines and includes, but is in no way limited to, the following:

a. If a lessee of a Xerox copy machine requested permission to have the plaintiff's Copy Controller-Keys installed on its copying machine, permission was denied despite the fact that the installation expense would be borne by the lessee of the copying machine, and the installation itself would be performed by either plaintiff's salesmen or the lessee.

b. If a lessee purchased or leased and installed a Copy Controller-Key, Xerox informed the lessee that Xerox did not allow the installation of the Copy Controller-Key on any Xerox copy machine and ordered the lessee to remove the device from any or all of its Xerox copy machines.

c. In other instances, the Xerox service personnel unlawfully, and without the authorization of the lessee, disconnected the Copy Controller-Key and refused to reconnect it after the service call was completed.

d. In other instances, the Xerox service personnel refused to service the copying machine further until the Copy Controller-Key was removed by the lessee.

e. In still other instances, Xerox threatened to remove its machine from the premises of the lessee if the lessee did not remove the Copy Controller-Key.

5. Xerox has attempted to justify its unlawful course of conduct by representing to lessees of its machines that it cannot permit installation of plaintiff's Copy Controller-Key upon its machines because plaintiff's device has not been approved for use by Underwriter's Laboratories, Inc. ("U.L." as an accessory to Xerox's machines. This representation has been made despite the fact that plaintiff's device itself has been ap-

proved by U.L. Xerox has further represented to lessees of its machines that if plaintiff were to secure U.L. approval of the device as an accessory to its machines, Xerox would have no further objection, provided that it could be shown that installation of plaintiff's device would in no way damage the Xerox machine. Xerox has made these representations despite knowledge that plaintiff has requested Xerox to permit U.L. to test plaintiff's device upon Xerox's machines, that Xerox has refused to grant such permission and that U.L. will not conduct such tests without the permission of Xerox.

6. This combination carried out by Xerox and lessees of its machines has restrained and will continue to restrain the marketing of plaintiff's products and constitutes a combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This unlawful course of conduct carried out by Xerox individually and in combination with its lessees is a willful violation of common law principles of unfair competition and tortious interference with plaintiff's advantageous business relationship.

Xerox in support of its motion for Summary Judgment contends that there is no genuine issue of material fact and as a matter of law the plaintiff's Complaint is without merit. The defendant Xerox bases its position on the fact that Polytechnic's device has been tested and listed by U.L. for use in combination with all Xerox model copying machines pursuant to a method of attachment devised by Xerox,[2] and Xerox has indicated that Polytechnic is free to make installations by means of this method of attachment. The defendant thus conceives the only issue in the instant action to be a legal question of whether Xerox has violated the law by unilaterally implementing reasonable conditions to protect its property and the users thereof.

The plaintiff in opposition to the instant motion contends that there exists a genuine issue of material fact which precludes summary judgment because: (1) Xerox adopted a "new" policy with respect to attachments; (2) its "old" policy was unreasonable; (3) the charge for Xerox interface equipment (a universal surface plug system for devices such as the plaintiffs) inhibits Polytechnic's ability to market its device in competition with the Auditron; and (4) Xerox's refusal to permit others to install interfact equipment of their own manufacture by their own employees is a tie-in arrangement.

It is important to the proper disposition of the instant motion to consider the following facts disclosed by pre-trial discovery and hearings:

1. The salient events in this case began in January of 1969, when Nicholas Flevaris, who was to become President of Polytechnic upon its formation in February of 1969, first put together his own key device, although he did not have a prototype of said device until March or April, 1969 (Flevaris PI 65).[3] During most of 1969, Polytechnic offered the device for sale through direct mail to copying machine users, including Xerox lessees (Flevaris PI 66–68) and by advertisement in an office management trade journal offering a 30-day free trial coupon (Linne Dep. 709–711; Linne Dep. Ex. 16). Polytechnic encouraged purchasers to install the device themselves on the copying machines.[4] Although the device

2. The listing does not cover Xerox 3100 which was first introduced in April 1973 after testing had been completed.

3. References to testimony and exhibits identified at the Preliminary Injunction Hearings on December 16–18, 1970 are hereafter cited as either PIPX _____ or PIDX _____ for documents or [witness' name] PI _____ for transcript.

4. Customers were told "any technician or plant maintenance man can and has per-

was being installed during the fall of 1969 on Xerox copying machines known by Polytechnic to be owned by Xerox, no effort was made to notify Xerox or to furnish it with a wiring diagram (Flevaris PI 70).

2. In the Xerox Service Agreement, the Xerox lessee promises to "make no alteration in equipment". In part, this provision relates to the requirement of U.L. that the failure of a manufacturer to secure U.L.'s approval for changes in a listed product "shall result in discontinuance of listing of the product". (PIDX 78). In November 1967 before either Polytechnic or its devices were in existence and three years prior to this lawsuit, Xerox announced a uniform policy defining the three conditions under which it would permit the attachment of third party accessories to copying machines owned and leased by it (Finein PI 246–247; Trompter PI 253; PIPX 28–29). First, Xerox designated a standard which it had previously set for itself, namely that the accessory be tested by U.L. in combination with the copying machine and be recognized as safe. Second, Xerox required that the third party attachment not damage the copying machine. Third, Xerox required that the third party attachment not interfere with the normal operation and servicing of the copying machine. [The Court will note in passing that Polytechnic has failed to make any allegation that it has complied with these seemingly legitimate conditions.]

3. At the time of filing the instant lawsuit, Polytechnic only had a general listing from U.L. solely for the Copy Controller-Key device and not in connection with the device's operation with another product.[5] The general listing issued by U.L. is its notice to the public that it has run tests and considers a product safe for general use. (Knourek Dep. 13). While general listing would have indicated the safety of the initial combination, U.L. felt that its responsibility did not end there but rather that it "should also make sure that continuing production of these two machines resulted in the safe combination". (Knourek Dep. 39). There was reluctance on U. L.'s part to test and issue a general listing for a combination before a workable system was established for handling the general listing in the event that future changes in either product resulted in an unsafe combination. (Knourek Dep. 23–24; Knourek Dep. Ex. 3). While Xerox, U.L. and Polytechnic all made various suggestions as to how to handle this concern of U.L., no solution was reached until Xerox proposed the universal surface plug system. Xerox informed Polytechnic of this solution and went to U.L. to obtain testing and general listing for its combination. U.L. found the universal plug system to be acceptable and to overcome its earlier concerns. It proceeded to test the Xerox harness and plug combination with all existing models of Xerox machines and on November 28, 1972, U.L. informed Xerox that approval had been issued. Subsequently, the

---

formed it" (PIDX 10) ; and an information sheet circulated by Polytechnic stated that they could be "installed by any technician" (PIDX 13).

5. Xerox's requirement of U.L. approval of an accessory before it can be attached to a Xerox machine is quite reasonable. In fact, numerous local and state governments as well as the federal government

in the recently enacted Occupational Safety and Health Act, 29 U.S.C. §§ 651–678, require that electrical units have U. L. approval prior to their being installed. See also, Chicago Municipal Code, Chapter 87–100, Definition of "Approved", the Electrical Code of the City of Los Angeles (L.A. Electrical Code, Sec. 93–0402).

Copy Controller-Key was tested and listed for use in combination with Xerox copying machines by means of this plug (Flevaris Dep. Ex. 79).[6] The use of the U.L. approved universal surface plug will ensure compliance with Health and Electrical laws such as the Federal Occupational Safety and Health Act, and numerous state and local ordinances; and it will, at the same time, provide one means of a safe and efficient method of attachment of third party devices to the complex machinery which is marketed by Xerox.[7]

It is the opinion of this Court after examining the pleadings and relevant case law that the defendant's motion for Summary Judgment is meritorious.

## I. XEROX'S POLICY ON ITS FACE DOES NOT CONSTITUTE AN UNREASONABLE RESTRAINT OF TRADE

■ The announcement of restrictions by Xerox regarding the attachment of plaintiff's device does not constitute *per se* a restraint of trade.

■ Conditions premised on legitimate business interests have been recognized as reasonable and thus do not *per se* constitute a violation of the Sherman Act. It is well settled that a manufacturer can adopt and implement a policy which is designed to protect its property and the users of its property, and to promote safety. Weather Wise Co. v. Aeroquip Corp., 468 F.2d 716 (5th Cir. 1972), cert. denied 410 U.S. 990, 93 S.Ct. 1505, 36 L.Ed.2d 188 (1973); Bridge Corp. of America v. American Contract Bridge League, Inc., 428 F.2d 1365 (9th Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971); Kendall Elevator Co. v. LBC & W Associates of South Carolina, Inc., 350 F.Supp. 75 (D.S.C.1972). Indeed, even absolute restrictions have been permitted where necessary to protect legitimate business interests such as product or personal safety. Tripoli Co. v. Wella Corp., 425 F.2d 932 (3rd Cir. 1970), cert. denied 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

Xerox's restrictions are on their face reasonable because they are purportedly aimed at protecting the public against injury and Xerox against product liability claims.[8] It is clear to this Court that

---

6. Although previously marketing them without even receiving component recognition from U.L., Polytechnic also received approval for its coin control and key/coin control devices in combination with Xerox copying machines by means of the surface plug. (Flevaris Dep. Ex. 83–84).

7. Burton Linne, formerly vice president of Polytechnic and now president of Design America Corporation which makes a competitive control device called the Auditizer, termed the plug method of attachment "vastly superior in every respect . . . to entering a copying machine" (Linne Dep. 1083). One of the bases for his opinion was that this method does not require the high level of skill that is required when the installers must go inside a copying machine. This, in turn, reduces the chances of malfunctions following the installations. In addition, this method lightens the burdens on the manufacturer of the control system with respect to pre-engineering, installation and removal of

his product, and allows him to expand his sales effort. (Linne Dep. 1084–8).

8. Xerox's three conditions on any attachment of a device are clearly reasonable: 1. *The U.L. Testing Condition.* In this day and age when the federal government through product safety commissions and consumer protection legislation is taking drastic steps to force manufacturers to pay more attention to safety and numerous state and local governments require U.L. approval, it is clear that Xerox's concern over safety is reasonable.
2 & 3 *The No Damage and No Interference Conditions.* The conditions that the attachment not damage the copying machine or interfere with its operation or servicing are also clearly sanctioned by the law. Xerox has a duty to protect its own equipment from the standpoint of safety. It also has a right to insure proper functioning of the equipment and prevention of damage to the equipment. Pursuant to this

Xerox's conditions on attachment of third party devices to its machines are reasonable and do not *per se* violate the Sherman Act.

## II. IT HAS BEEN CLEARLY DEMONSTRATED THAT XEROX HAS NOT MISUSED OR MISAPPLIED ITS POLICY

 The pre-trial discovery to date presents no factual support to the claim by Polytechnic that Xerox unfairly applied its policy to Polytechnic. It is clear that Xerox's condition that Polytechnic's device be tested and approved by U.L. is reasonable and practically wise. U.L.'s combination listing of Polytechnic's Copy Controller-Key and Xerox machines was only recently issued on November 28, 1972. This combination listing was only possible after Xerox had developed a universal plug system that would overcome difficulties present in the method of attachment used by Polytechnic and would meet the safety requirements set by U.L. Polytechnic's installation instructions called for the attachment of its devices by running wires into and through the Xerox machine without the plug and connecting wires internally to various machine wires and terminals (Flevaris Dep. Ex. 74 B–D, 85, 86). Under this method "a plug is not even placed on the machine" (Flevaris Dep. 1106), although the har-

ness submitted to U.L. for testing "terminated to a plug for the purpose of making entry into the machine" (Flevaris Dep. 1107) and the method of interconnection used in testing leading up to the issuance of U.L.'s approval was the Xerox universal surface plug (Flevaris Dep. 1133, 1148).

While Polytechnic has allegedly developed a plug attachment system, it has not been approved by U.L. and the only universal surface plug system approved by U.L. to date is the one developed by Xerox. Xerox's universal plug which allowed the U.L. combination listing of its machines and other third party controller devices is an adequate demonstration of Xerox's good faith.

Polytechnic rejects Xerox's universal plug as too costly and thus claims Xerox's universal plug system is not an acceptable solution to the instant controversy. However, Polytechnic has failed to develop by itself an attachment or universal plug system which is approved by U.L. Polytechnic's failure to sufficiently meet Xerox's proper and reasonable condition of U.L. testing and approval erodes their claim that Xerox's conditions have been misapplied. The plaintiff has failed to sufficiently allege and pre-trial discovery fails to disclose that Xerox has misapplied its conditions for attachment to its machine in order to restrain trade.

responsibility, it insists on carefully studying and testing such devices as third parties propose to attach to its machines. The right of a lessor of equipment to establish conditions or specifications to which other products must conform in order to be used in combination with the lessor's own products has been preserved for many years in classic antitrust cases. International Salt Co. v. United States, 332 U.S. 392, 397, 68 S.Ct. 12, 92 L.Ed. 20 (1947); IBM v. United States, 298 U.S. 131, 139–140, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); United States v. United Shoe Machinery Co., 264 F. 138 (E.D.Mo. 1920), aff'd 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). Indeed in some cases the courts have permitted a manufacturer to impose restrictions even

after relinquishing all rights to the equipment by sale rather than lease. This is especially so when technologically complex equipment, such as Xerox machines, are involved. United States v. Jerrold Electronics Corp., 187 F. Supp. 545 (E.D.Pa.1960), aff'd 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); Teleflex Industrial Products, Inc. v. Brunswick Corp., 293 F.Supp. 106 (E.D.Pa.); Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653 (1st Cir. 1961), cert. denied 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961). Surely, manufacturers who lease their equipment have an even greater interest in seeing that the equipment operates properly in order to preserve the lessor's good will and to protect the physical integrity of their equipment.

8

It is clear from the cases that there is no anti-trust violation in adopting and implementing a policy which is designed to promote safety, protect the integrity of one's property or good will or assure proper functioning of equipment. Indeed, what Xerox has required is exactly what various local governments have insisted upon in their electrical codes, namely, U.L. approval and testing. This is exactly what Polytechnic has failed to accomplish by itself.

Moreover, Xerox has not misused or misapplied this legitimate policy with respect to Polytechnic. Indeed, Polytechnic was given an opportunity to conform to the prescribed conditions, and to date Polytechnic has failed to comply with this condition.

## III. POLYTECHNIC HAS FAILED TO ADEQUATELY ALLEGE AN ILLEGAL COMBINATION OF XEROX WITH ITS LESSEES

■ Essential to any Section 1 Sherman Act violation is the existence of a "contract, combination in the form of trust or otherwise or conspiracy" in restraint of trade (15 U.S.C. § 1). The violation must be comprised of concerted action by separate business entities, as opposed to mere unilateral action by a single person or firm. See Dart Drug Corp. v. Parke, Davis & Co., 120 U.S. App.D.C. 79, 344 F.2d 173, 182–183 (1965).

■ Polytechnic has alleged that Xerox has combined with certain of its les-sees who have "acquiesced" in the prohibition of the attachment of devices to its machines. (Compl. ¶ 9). These charges do not contain the "collaborative element" of a combination or conspiracy required by the Sherman Act. Dart Drug Corp. v. Parke, Davis & Co., supra. The express basis for this claim is nothing more than the unilateral acts of Xerox. There is no allegation that Xerox engaged the co-operation of any of its lessees to compel other lessees to abide by the Xerox policy; nor is there any allegation that any of the lessees joined together to compel other lessees to abide by the policy. All actions taken were by Xerox. Indeed, there would be no logical reason for the Xerox lessees to join together, either with Xerox or themselves, to enforce Xerox's own policy particularly if plaintiff's allegation about the efficacy of its device is well founded. The alleged mere acquiescence by certain individual Xerox lessees in the unilateral policy of Xerox does not give rise to an illegal combination.[9]

The absence of any potential gain on the part of Xerox lessees if the use of Polytechnic's device were prevented is fatal to Polytechnic's claim of combination.

It is not sufficient to merely allege acquiescence and thus claim a combination has been demonstrated. The finding of an illegal combination has traditionally been based upon the fact that the third parties benefitted from their acquiescence.[10] There could be no benefit

9. This was implicitly recognized by the Supreme Court in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) when it found that the acquiescing dealers were informed that if they complied with price maintenance programs, their principal competitors would also do so and that all would benefit by uniform adherence to the program. However, the Supreme Court made it clear that had the dealers individually acquiesced in the policy solely because of their desire to remain a dealer, there would have been no combination (Id. at 45, 80 S.Ct. 503). In other words, it was not merely individual desire to remain a dealer that caused the dealers to adhere to the program, it was the collective desire of the acquiescing dealers to make the program a success (in which case they would all benefit by absence of price competition among each other) which, together with the positive efforts of several wholesalers to carry off the program, supplied the collaborative element required by Section 1.

10. The absence of potential benefit to third parties precludes a finding of combination or conspiracy. See Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143 (D.Md.1968), aff'd 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

to the lessee of Xerox from acquiescence since, if Polytechnic is correct in its assertions, these lessees could only benefit by installing Polytechnic equipment.

It is clear that the actions of Xerox were not pursuant to an illegal combination or conspiracy between Xerox and its lessees. The Xerox policy was apparently adopted as an independent business decision without consultation or collaboration with its lessees who, in fact, are neither competitors of Polytechnic, Xerox, nor necessarily competitors of each other. In fact, Xerox's lessees are putative consumers of Polytechnic devisees. Under these circumstances, plaintiff's claim of combination must fail. There is neither a legal basis nor substantial evidence to support plaintiff's claim of unlawful concert of action.

## IV. NO ILLEGAL TIE-IN HAS BEEN DEMONSTRATED

■ Polytechnic in its brief in opposition to the instant motion alleges that Xerox has set up an illegal tie-in arrangement in that Xerox requires its universal plug system to be used in all attachment of third party devices to Xerox machines because it is the only attachment approved by the U.L. Plaintiff's anti-trust count has, in fact, been brought only under Section 1 of the Sherman Act and does not allege a tie-in violation. Indeed, the thrust of plaintiff's complaint is to the contrary, namely that Xerox wanted no control devices installed upon its machines.

The basic principle of a tie-in is that a manufacturer conditions purchases of desired products upon the purchase of unwanted products. Moreover, the traditional purpose of a tie-in is to enable the manufacturer to obtain additional revenue and profit (often undue profit) and to preclude his competitors from the market. Neither fact is present in the instant case. Xerox is not in the business of selling or leasing its interface equipment in order to gain economic benefit or to preclude its competitors from marketing similar equipment. Rather, it is providing this equipment, allegedly at a loss to itself, as a means by which others can market and install their products in a safe, efficient manner where none previously existed.[11] It is clear that no tie-in violation has been adequately pleaded.

## V. XEROX IN ITS EFFORTS TO PROTECT ITS PROPERTY INTEREST IN MACHINES HAS NOT COMMITTED THE COMMON LAW TORTS OF UNFAIR COMPETITION OR TORTIUS INTERFERENCE WITH PLAINTIFF'S BUSINESS RELATIONSHIPS

Plaintiff alleges that the conduct set forth above is also tortious. Count II alleges that Xerox has been guilty of unfair competition and Count III alleges that Xerox has committed tortious interference with the plaintiff's advantageous business relationships. In both counts plaintiff alleges that Xerox's conduct has been carried out "maliciously and with wanton disregard for plaintiff's right to market its product" (Compl. Counts II–III, ¶ 15).

■ The common law rights which the plaintiff purports to assert in Counts II and III must be evaluated in light of common law rights that Xerox has and is entitled to protect; namely

11. Polytechnic contends that it should be permitted to continue to invade Xerox machines in a manner not approved by U.L. by using its own harness and installation method. To support this contention, Polytechnic alleges that the Xerox interface equipment (Xerox's U.L. approved universal surface plug system) involves an unreasonable $60.00 charge for providing the equipment and installing it.

Polytechnic itself charges $24 solely to install and $24 to remove its equipment when a customer purchases the Polytechnic device, a charge it absorbs when a customer rents the unit (Flevaris Aff. ¶ 1). Design America, a competitor of Polytechnic charges its customers $25 for installation of its main unit and $10 for installation of its slave unit.

(1) its property rights in its machines, (2) its contractual rights in its lease agreements, and (3) its right to preserve the reputation of its business.

■ As owner of the machines, Xerox has an absolute property right therein, a right which courts have consistently recognized that the owner is entitled to protect. One's ownership rights in tangible personal property include a right to prohibit the attachment of devices thereto, or to retain authority to decide whether such attachment shall be made. Illinois Bell Telephone Co. v. Miner, 11 Ill.App.2d 44, 136 N.E.2d 1 (1956). See also In Re Farrell Publishing Corp., 165 F.Supp. 40 (S.D.N.Y. 1958), aff'd sub nom. Hendler v. Cuneo Eastern Press, Inc., 279 F.2d 181 (2nd Cir. 1960); Winters v. University Dist. Bldg. & Loan Ass'n, 268 Ill.App. 147 (1932); Quinlivan v. Brown Oil Co., 96 Mont. 147, 29 P.2d 374 (1934); Milliken v. Hildebrand, 234 Ill.App. 276 (1924); Bliss v. So. Pac. Co., 212 Or. 634, 321 P.2d 324 (1959); Krause v. Hartford Accid. & Indem. Co., 331 Mich. 19, 49 N.W.2d 41, 44–45 (1951); Herbits v. Constitution Indem. Co., 279 Mass. 539, 181 N.E. 723 (1932).

■ One having an interest in personal property is entitled to protect that interest against unauthorized intermeddling. The right to do so is not only a good defense to an action for wrongful interference, it gives rise to an action against the intermeddler. See E. Rauh & Sons Fertilizer Co. v. Shreffler, 139 F.2d 38 (6th Cir. 1943); Royal Stein, Inc. v. B.C.U. Holding Corp., 283 App. Div. 700, 127 N.Y.S.2d 886 (1954); Morris Plan Co. v. Hillcrest Farms Dairy, Inc., 323 Mass. 452, 82 N.E.2d 889 (1948). See also, Restatement of Torts 2nd, section 220.

■ It is clear that under the law Xerox is entitled to exercise and protect its property rights, and by so doing it is not guilty of unfair competition or tortious interference with the plaintiff's business interests.

Thus, the plaintiff has failed to adequately allege that Xerox is liable for the common law torts alleged. Further, the inadequacy of the plaintiff's antitrust allegations necessarily casts serious doubts on any allegation of tortious conduct. See Bridge Corp. of America v. American Contract Bridge League, Inc., *supra*.

It is the opinion of this Court after examining the pleadings and the affidavits and the exhibits presented by the parties in support of their respective positions that Summary Judgment should be granted in favor of the defendant. There exist no genuine issues of material fact to be resolved by this Court. The plaintiff has failed to adequately comply with reasonable and proper conditions established by Xerox in order to protect the public against injury, and the defendant Xerox against potential product liability claims. The plaintiff has failed to adequately allege an illegal combination of Xerox and its lessees. These failures have been fatal to both the plaintiff's anti-trust claim and its common law tort claims. However, this decision would not preclude the plaintiff at a future date, given an attempt by the plaintiff to adequately comply with the conditions of Xerox, from bringing an action against the defendant Xerox for subsequent anti-trust and common law tort violations.

It is this Court's opinion that the major problem with plaintiff's case might well be that the plaintiff prematurely called foul before he had made any attempt to reasonably comply with the proper and necessary conditions established by Xerox to protect its property rights.

Accordingly, it is hereby ordered that the Defendant's Motion for Summary Judgment is granted.